KELLUM, Judge.
Kenneth Adam McKinnis was convicted of murder made capital because it was committed during the course of a robbery, a violation of § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 10-2, the jury recommended that McKinnis be sentenced to death. The trial court followed the jury’s recommendation and sentenced McKinnis to death.
The evidence adduced at trial indicated the following. In the early morning hours *1267 of August 19, 2006, Byron Lewis Belser was shot and killed in the Champagne Lounge, a strip club in Dothan (hereinafter “the club”). Dr. Corrine Elizabeth Stern, who in 2006 was a medical examiner for the State of Alabama and who performed the autopsy on Belser, testified that Belser died from a single gunshot wound to the right thigh. The bullet traveled left to right across Belser’s body and slightly upwards. As it traveled through Belser’s body, the bullet nicked the right iliac vein and artery, perforated the right ureter, traveled through the pelvic area toward the left hip bone, nicked the left iliac vein and artery, and came to rest in the left thigh. The bullet was extracted and sent for forensic testing. Dr. Stem testified that the nicked veins and arteries would have caused substantial bleeding into the pelvic and abdominal regions, resulting in pain and difficulty breathing before Bel-ser’s death.
Evidence was presented that at approximately 11:30 p.m. the night of August 18, 2006, MeKinnis and three friends, Kyle McIntosh, Albert McLeod, and Mark Newman, arrived at the club. A video surveillance system[1] at the club captured the four men walking through the front door of the club into the front entryway, paying the cover charge for admission, and being patted down by a security guard. McKin-nis was wearing dark-colored shorts and a white t-shirt, and had on white-framed sunglasses; he had facial hair. Although MeKinnis was only 20 years old at the time, he was permitted to enter the club.[2] After entering, the four men went to the dance stage and sat at a table. Terri Burnett, the bartender at the club that night, testified that she sold the group four pitchers of draft beer, but nothing else. The video surveillance system recorded MeKinnis and his friends sitting near the dance stage drinking and watching the strippers for over two hours.
Newman left the club with a woman at approximately 1:45 a.m. on August 19, 2006. A few minutes later, MeKinnis, McIntosh, and McLeod also left the club. A few minutes after MeKinnis and his friends left, Michael Conaway, the owner of the club, was standing outside the front entrance of the club with his girlfriend, Shirah Robinson, and two other men when he noticed a man, whom he had seen inside the club earlier and whom he positively identified at trial as MeKinnis, get out of a white automobile parked in a parking lot across the street from the club and walk toward the club. Conaway testified that the man was wearing a pair of dark-colored shorts, was shirtless, had a rag wrapped around the bottom part of his face, and was carrying a silver or chrome-colored pistol in his left hand. As the man approached the entrance of the club, Cona-way said, he raised the gun and started shooting directly at the group of people standing outside. Conaway testified that he yelled and pushed Robinson and that everyone standing outside ran for cover. Robinson testified that she, too, saw a man get out of the white automobile across the street and approach the club entrance carrying a pistol; however, she could not identify the man. Robinson, like Cona-way, said that when the shooting began, everyone outside ran for cover. Robinson testified, however, that as the shooter approached the front door of the club, she heard him say “I’m going to get ... them niggers.” (R. 556.) Both Conaway and *1268 Robinson stated that they heard several gunshots outside and then heard additional gunshots coming from inside the club.
Burnett testified that she heard gunshots sometime after 1:00 a.m. the morning of August 19, 2006. The initial three or four shots, Burnett said, sounded like they were being fired outside the club. Nonetheless, she immediately got on the floor behind the bar. Burnett said that before the shooting began, Belser and another man were sitting at the bar; the other man left the bar area, and Burnett served Belser a drink just before she heard the shots. Burnett testified that Belser’s location was visible from the front entryway of the club. When she heard the shots, Burnett told Belser to get down, but Belser only laughed and told her not to worry because the shots were outside. At that moment, Burnett said, she heard five to six additional, much louder, shots being fired inside the club. Burnett stayed on the floor until the shooting ended and then got up, telephoned emergency 911 on her cellular telephone, and walked around to the front of the bar where she saw Belser lying on the floor bleeding.
The video surveillance system recorded the shooting from the perspective of the front entryway. The video shows a man running through the front door to the interior of the club at 1:56 a.m. Just after the man ran into the club, the front door opened again and McKinnis entered the club firing a pistol with his left hand. McKinnis had on the same or similar dark-colored shorts he had been wearing earlier in the club, but he had no shirt on and was not wearing sunglasses, and he had a rag tied around the bottom part of his face. After McKinnis entered, he swapped the gun from his left hand to his right hand and continued firing into the club as he reached with his left hand across the counter to the cash register. McKinnis was unable to open the cash register, and he then turned around and ran out the front door of the club.
Dothan police officers arrived at the scene within minutes of the shooting and secured the club. Paramedics were summoned, and they transported Belser to the hospital, where he later died. Jon Thomas, a crime-scene technician with the Do-than Police Department, found eight shell casings outside the club and four shell casings inside the club, several bullet holes both inside and outside the club, and three spent bullets inside the club. According to Thomas, there was one bullet hole in the outside of the front door, one bullet hole in the front-door frame, two bullet holes in the front of the bar, two bullet holes in the wall of the dressing room for the dancers, one bullet hole in the wall behind the cash register in the front entryway, and one bullet hole in the far left wall of the club. In addition, Thomas found a defect in the floor just in front of the left corner of the bar (as viewed from the front entryway) where one of the bullets had ricocheted.
Based on the location of the three bullets recovered and the location of the various bullet holes and defects, Thomas was able to determine that six shots had been fired inside the club and to determine the path of those shots. One bullet went through the wall to the left of the entryway, struck the floor near the left corner of the bar, ricocheted, and entered the far left wall of the club. Thomas said that he was unable to recover that bullet because it had gone too deeply into the wall and he did not want to severely damage the business to recover the spent bullet. Two bullets went through the wall of the dancers’ dressing room in the back right corner of the club. One of those bullets was recovered on the floor of the dressing room, but the second was not recovered. Two bullets also went through the front of *1269 the bar. Both of those bullets were recovered — one was on the floor behind the bar and the other was in the ice bin behind the bar. Another bullet hit Belser. Thomas testified that he was positive that the bullet that hit Belser had not ricocheted off of anything. He also was positive that the two bullets that hit the dressing room, the two bullets that hit the bar, and the bullet that went through the left wall of the entryway, ricocheted off the floor and entered the far left wall of the club had not hit Belser.
Antonio Gonzalez, a captain with the Houston County Sheriffs Department at the time of trial but a patrol sergeant with the Dothan Police Department at the time of the shooting, testified that he arrived at the club within a few minutes of the shooting. Capt. Gonzalez said that as he got out of his vehicle and headed toward the club, a black male approached him, pointed to the north and told him that the shooter had fled in a white Chevrolet automobile. Capt. Gonzalez looked to the north of the club and saw a white automobile turning onto Chickasaw Street. Capt. Gonzalez pursued the vehicle. Although he initially lost sight of the vehicle, Capt. Gonzalez reestablished visual contact -with the vehicle on the Montgomery Highway, and eventually stopped the vehicle on Rebecca Street. McLeod was driving the vehicle; McKinnis was in the front passenger seat; and McIntosh was in the backseat.
Becky Edwards, also a crime-scene technician with the Dothan Police Department, found inside the vehicle a .40 caliber Glock brand semiautomatic pistol on the floorboard behind the driver’s seat; a .40 caliber magazine in the glove compartment with 10 live rounds in it; $43 in cash in the glove compartment; a pair of white-framed sunglasses on the back seat; a black t-shirt on the driver’s seat; and several empty beer bottles. Just outside the vehicle, near the back tire, Edwards found a dark-colored rag or scarf.
Katherine Richert, a firearms and tool-marks examiner with the Alabama Department of Forensic Sciences, testified that she examined the 12 shell casings found at the club, the 3 spent bullets found at the club, the spent bullet recovered from Bel-ser’s body, and the .40 caliber Glock pistol that was found in the white automobile. Richert said that all four spent bullets were .40 caliber bullets and had similar microscopic markings but that none of the spent bullets had sufficient microscopic markings to positively determine whether they had been fired from the .40 caliber Glock pistol. Richert stated, however, that all 12 shell casings found at the club were fired from the .40 caliber Glock pistol found in the white automobile. Richert described the Glock pistol as a “semi-automatic pistol” (R. 841) that had three different safeties on it, all of which would have had to have been disengaged for the pistol to fire. She also said that the trigger on the Glock pistol required six pounds of pressure to fire. Richert testified that the three spent bullets found in the club were somewhat damaged, as if they had passed through or hit a hard object, while the spent bullet recovered from Belser’s body was not damaged at all, even the nose of the bullet was not misshapen; the bullet was fully intact and was the “whole bullet.” (R. 829.) She also said that none of the four spent bullets had “any marks that were consistent with , that of a ricocheted bullet.” (R. 858.)
McKinnis’s defense at trial was that the crime he committed was not capital murder. Although McKinnis pleaded not guilty, McKinnis never claimed, or presented evidence indicating, that he was not the shooter at the club the night that Belser was killed. Rather, McKinnis claimed that he did not intend to kill Bel- *1270 ser when he fired the shots inside the club. McKinnis’s defense was based on his consumption of alcohol the night of the shooting; on the location of the bullet holes inside of the club, spread throughout the club; and on the location of the wound to Belser, in his right thigh. In addition, McKinnis argued that Belser was sitting near the left front corner of the bar when he was shot, in a location that McKinnis claimed could not be seen from the front entryway of the club, thus indicating that Belser must have been hit by a bullet that had ricocheted and that McKinnis had no intent to kill Belser.
Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
As this Court explained in Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
“As is the case with every death penalty case, this court is obliged, pursuant to Rule 45A, Ala. R.App. P., to review the transcript of the proceedings for plain error, whether or not the issue was raised before the trial court or on appeal. Plain error is defined as error that has ‘adversely affected the substantial right of the appellant.’ The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
820 So.2d at 121-22. “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). In reviewing the record pursuant to our duty under Rule 45A, Ala. R.App. P., we have found plain error that requires reversal of McKinnis’s conviction and sentence.
McKinnis was indicted for capital murder during a robbery as follows:
“The Grand Jury of said county charge that, before the finding of this indictment, KENNETH ADAM MCKINNIS, whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of BYRON LEWIS BELSER, BY SHOOTING HIM with a PISTOL, and KENNETH ADAM MCKINNIS caused said death during the time that KENNETH ADAM MCKINNIS was in the course of committing a theft of U.S. CURRENCY, the property of CHAMPAGNE LOUNGE, by the use of force against the person of MICHAEL CON *1271 WAY, [sic] with intent to overcome his physical resistance or physical power of resistance, while the said KENNETH ADAM MCKINNIS was armed with a deadly weapon or a dangerous instrument, to-wit: .40 CALIBER TAURUS PISTOL, in violation of Section 13A-5-40(a)(2) of the Code of Alabama, against the peace and dignity of the State of Alabama.”
(C. 20; emphasis added.) The indictment charged McKinnis with murdering Belser during the course of robbing Conaway.
However, during its oral charge, the trial court instructed the jury that to find McKinnis guilty of murder made capital because it was committed during a robbery, the jury could find that McKinnis murdered Belser during the course of robbing either Conaway or Belser. The trial court began its oral charge by reading the indictment to the jury.[3] The court then instructed the jury on the presumption of innocence, reasonable doubt, the avoidance of sympathy, the credibility of witness, and the differences between direct and circumstantial evidence. At that point, the court instructed the jury on the elements of capital murder based on an underlying robbery, in relevant part, as follows:
“Now, I’m going to give you the elements of capital murder during a robbery, followed by the lesser-included offense of murder. The lesser-included offense of murder has three categories that I’m going to describe. There are three ways that a person can be convicted of murder if they are not convicted of capital murder.[4]
“Now, concerning capital murder in this case, the State alleges that it was committed during the commission or the attempt to commit a robbery. The defendant is charged with capital murder. The law states that an intentional murder committed during a robbery in the first degree is capital murder. A person commits an intentional murder if he causes the death of another person and, in performing the act or acts which causes the death of that person, he intends to kill either that person or another person. That is called specific intent.
“A person commits a robbery in the first degree if, in the course of committing or attempting to commit a theft, he uses force against the person of the owner or any person present with the intent to overcome his physical resistance or physical power of resistance, or threatens the imminent use of force against the person of the owner or any person present with the intent to compel acquiescence in the taking or escaping of the property, and in doing so, is armed with a deadly weapon.
“So to convict the defendant of capital murder, the State must prove beyond a reasonable doubt each of the following elements of intentional murder during a robbery in the first degree: Number one, they have to prove that the victim is deceased. Number two, that the defendant, Mr. McKinnis, caused the death of Mr. Belser, the victim in this case. And that he intended to kill Mr. Belser or some other person. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and it must be specific.
“The next element is that the defendant committed or attempted to commit *1272 a theft of, in this case, money, and that in the course of attempting — committing or attempting to commit a theft or the immediate flight from the commission, the defendant either used force or the imminent use of force against the person of either Mr. Conaway or Mr. Bel-ser, Mr. Conaway being the owner of the money, with the intent to overcome his physical resistance or power to resist, or to compel in the acquiescence of taking or escaping with the property.”
(R. 1034-36; emphasis added.)
The record reflects that during its deliberations, the jury asked the court to “clarify capital murder.” (R. 1054.) The trial court again instructed the jury that to find McKinnis guilty of capital murder during a robbery, the jury could find that McKinnis murdered Belser during the course of robbing either Conaway or Belser. The court stated:
“The defendant is charged with capital murder. And the law states that an intentional murder committed during a robbery in the first degree is a capital murder. A person commits an intentional murder if he causes the death of another person, and in performing the act or acts which caused the death of that person, he intends to kill that person or another person.
“A person commits a robbery in the first degree if, in the course of committing or attempting to commit a theft, he uses force against the person of the owner, or any person present, with the intent to overcome his physical resistance or physical power of resistance, or threatens the imminent use of force against the person of the owner or any person present, with the intent to compel acquiescence in the taking of or escaping with the property and, in doing so, he is armed with a deadly weapon. “To convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder during robbery in the first degree: Number one, they must prove that Mr. Belser is deceased. Number two, they must prove that the defendant, Mr. McKinnis, caused the death of Mr. Belser by shooting him with a pistol. Number three, that in committing the act which caused the death of Mr. Bel-ser, that the defendant intended to kill the deceased or someone else, another person. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific. Number four, that the defendant committed or attempted to commit theft of money. Number five, that in the course of committing or attempting to commit the theft, or in the immediate flight therefrom, the defendant either used force or threatened use of force — imminent force against the person of either Mr. Belser or Mr. Conaway with the intent to overcome his physical resistance or physical power to resist, or to compel the acquiescence in the taking of the property, and that the defendant was armed with a deadly weapon. Number seven, that the murder took place during the robbery.”
(R. 1054-56; emphasis added.)
It is well settled that a “trial court’s charge to the jury can effectively amend an indictment.” Wright v. State, 902 So.2d 720, 731 (Ala.Crim.App.), aff'd 902 So.2d 738 (Ala.2004). “In addition to a formal amendment, an indictment can be informally 'amended’ by actions of the court or of the defendant.” Wright v. State, 902 So.2d 738, 740 (Ala.2004). See also Brooks v. State, 973 So.2d 380 (Ala.Crim.App.2007); Williams v. State, 701 So.2d 832 (Ala.Crim.App.1997); and Styles *1273 v. State, 474 So.2d 185 (Ala.Crim.App.1985). However, Rule 13.5(a), Ala.R.Crim. P., prohibits any amendment to an indictment, whether formal or informal and with or without the defendant’s consent, that changes the offense or charges a new offense not contemplated by the indictment. As the Alabama Supreme Court explained in Ash v. State, 843 So.2d 213 (Ala.2002), overruled on other grounds, Ex parte Seymour, 946 So.2d 536 (Ala.2006):[5]
“Rule 13.5(a), Ala. R.Crim. P., forbids amending an indictment ‘to change the offense or to charge a new offense not contemplated by the original indictment.’ This rule preserves the implementation of Article I, § 6, Alabama Constitution of 1901, guaranteeing ‘[t]hat in all criminal prosecutions, the accused has a right ... to demand the nature and cause of the accusation; and to have a copy thereof ... ’ and Article I, § 8, as amended by Amendment 37, Alabama Constitution of 1901, guaranteeing that contested felonies will be charged by grand jury indictment, State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 687, 296 So.2d 779, 781 (1974); and Thorn v. State, 39 Ala.App. 227, 227, 98 So.2d 859, 860 (1957); see also Kennedy v. State, 39 Ala.App. 676, 690, 107 So.2d 913, 926 (1958). The fundamental constitutionally guaranteed benefits of an indictment to an accused are ‘ “that he may prepare his defence, and plead the judgment as a bar to any subsequent prosecution for the same offence.” ’ Gayden v. State, 262 Ala. 468, 477, 80 So.2d 501, 504 (1955) (quoting United States v. Simmons, 96 U.S. 360, 362, 24 L.Ed. 819 (1877)).”
843 So.2d at 216.
In this case, it is clear that the trial court’s instructions to the jury constructively amended the indictment. In order to convict McKinnis of the offense charged in the indictment, the jury would have had to find that McKinnis murdered Belser during the course of robbing Conaway. However, in order to convict McKinnis of the offense as instructed by the trial court, the jury could have found that McKinnis murdered Belser during the course of robbing Conaway or that McKinnis murdered Belser during the course of robbing Bel-ser. The questions before this Court, then, are whether the trial court’s constructive amendment to the indictment violated Rule 13.5(a) and, if so, whether the amendment rose to the level of plain error. We answer both questions affirmatively.
In McKinney v. State, 511 So.2d 220 (Ala.1987), the Alabama Supreme Court adopted the view of the majority of jurisdictions that when a single criminal transaction involves multiple victims, multiple convictions are permitted. The Court explained, in relevant part:
“Neither the federal nor the state constitution poses an obstacle to permitting multiple prosecutions when there has been more than one offense found. In Gordon v. State, 71 Ala. 315 (1882), this Court held that the constitutional guaranty against double jeopardy does ‘not extend to several prosecutions for several offenses, but to repeated prosecutions for the same offense.’ Id., at 317, as cited in [R. Owens, Alabama’s Minority Status: A Single Criminal Ad Injuring Multiple Persons Constitutes Only A Single Offense,] 16 Cum. L.Rev. [85,] 101 [ (1985-86) ]. The minority views a single blast that injures two people as the ‘same offense’ or one criminal act. By contrast, the majority regards such an act as two offenses. As the author of *1274 the law review article has pointed out, the determination of what is the same offense is a question for the courts to decide. 16 Cum.L.Rev., supra, at 101. He concludes that §§ 15-8-8 and 13A-1-8 do not bar multiple convictions as the result of a single act when multiple victims are involved....
[[Image here]]
“[A]s Owens points out, legislative intent to allow multiple prosecutions for a single act that injures more than one person is determined by the ‘description of the unit of prosecution within the substantive criminal law statutes.’ 16 Cum. L.Rev., supra, at 104.
“Avoidance of ambiguity is essential. Owens asks:
“ ‘How, then, should the unit of prosecution be described so that an intent to allow multiple convictions is clear and unequivocal? Instead of using the word “any” to describe the unit of prosecution, the singular words “a” or “another” should be used. An examination, then, should be made of the Alabama Criminal Code to see how the unit of prosecution is described. This examination will disclose whether the code allows multiple convictions.
“ ‘A review of the criminal code discloses that there are basically four categories into which the statutes can be divided. The first category includes those statutes that prohibit conduct that cannot affect multiple persons or property with a single act. These statutes prohibit such crimes as sex offenses, criminal trespass, burglary, forgery, and escape. The second category contains statutes in which the unit of prosecution is described with the word “any”; based on the above mode of statutory construction, only one conviction should be allowed. This category consists of the following statutes: interference with custody, indecent exposure, enticement of a child to enter a vehicle or house for immoral purposes, possession of burglary tools, criminal possession of explosives, and transportation of stolen property, or property obtained by false pretense into the state.
“ ‘Under the majority view, the remaining two categories would allow multiple convictions. The third category uses the indefinite article “a” to describe the unit of prosecution, and includes such offenses as arson, offering a false instrument for recording, illegally possessing or fraudulently using a credit or debit card, permitting or facilitating an escape, bribing or intimidating a witness or a juror, promoting prostitution, abandoning a child, and endangering the welfare of a child. The last category uses the descriptive term “another,” and incorporates, in addition to the above offenses, all forms of homicide, assault, kidnapping and unlawful imprisonment, theft of property, robbery, and the hindering of the prosecution or the apprehension of an escapee.
“ ‘By employing the method of statutory construction used by the United States Supreme Court to determine whether the legislative drafters intended to allow multiple convictions, it becomes clear that the Alabama Legislature formulated the criminal code using descriptive words that allow multiple convictions. To truly adopt the majority view, however, multiple convictions should be allowed only for crimes against persons. If Alabama accepts the majority rule allowing multiple convictions, future incidents in which more than one person is in *1275 jured or killed by the same act will subject the defendant to as many convictions as there are injuries or deaths.
“16 Cum.L.Rev., supra, at 105-07.
“Owens has articulately stated the case for joining the majority of states that allow for multiple convictions when more than one person is injured as the result of a single act. Adoption of the majority view would place Alabama among those states that have recognized that punishment for a criminal act should be commensurate with the act itself and the injury caused by that criminal act. Absent statutory or constitutional obstacles to the adoption of the majority view, logic and reason persuade us to henceforth apply the principle that a single criminal act that causes injury to more than one person may constitute more than one offense and may support more than one prosecution and conviction.”
511 So.2d at 223-25.
This Court has applied the McKinney rule to the crime of robbery and held that a defendant may be convicted of multiple counts of robbery arising out of a single act or transaction where multiple victims are involved. See Sims v. State, 663 So.2d 975 (Ala.Crim.App.1994). Likewise, this Court has applied the McKinney rule to the offense of capital murder during a robbery and held that a defendant may be convicted of multiple counts of capital murder during a robbery arising out of a single act or transaction where there are multiple robbery victims, albeit only one murder victim. This Court explained:
“A person commits the crime of robbery in the first degree if, in the course of committing a theft, he or she uses force against the owner of the property or any person present with intent to overcome his physical resistance or
physical power of resistance, or threatens the imminent use of force against the owner of the property or any person present with intent to compel acquiescence to the taking of or escaping with the property, and he or she is armed with a deadly weapon or dangerous instrument or causes serious physical injury to another. §§ 13A-8-41 and 13A-8-43, Ala.Code 1975. A person commits the crime of murder if, -with intent to cause the death of another person, he or she causes the death of that person or of another person. Both robbery and murder are crimes against the person, and they both fall into the final two categories of statutes referred to in McKinney and R. Owens, Alabama’s Minority Status: A Single Criminal Act Injuring Multiple Persons Constitutes Only a Single Offense, 16 Cum.L.Rev. 85 (1985— 86), that allow multiple convictions when multiple victims are involved. Likewise, capital murder during a robbery also falls into the category of statutes allowing multiple convictions when multiple victims are involved. Section 13A-5-40(a)(2) defines capital murder during a robbery as ‘[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant.’ (Emphasis added.) The use of the indefinite article ‘a’ in describing the unit of prosecution allows for multiple convictions when a murder is committed during the course of multiple robberies of multiple victims. In other words, the capital offense of murder during a robbery contemplates that the murder was committed during the course of a single robbery. If the murder is committed during more than one robbery against more than one person, then more than one conviction for capital murder during a robbery is permitted, just as more than one conviction for *1276 robbery would be permitted, even when only one of the victims is murdered.”
Brooks v. State, 973 So.2d 380, 406-07 (Ala.Crim.App.2007).
In Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the United States Supreme Court faced a jury-instruction amendment similar to the one here. Stirone was charged with, and convicted of, unlawfully interfering with interstate commerce. The indictment specifically charged Stirone with interfering with a Pennsylvania company’s importation of sand from other states. That sand was used to fulfill a concrete-production contract, and the concrete was to be delivered to another party and used for the erection of a steel-processing plant, which would in the future ship steel out of state. In addition to the evidence of Stirone’s interfering with the importation of sand, the Government introduced evidence that Stirone’s acts also affected interstate commerce by ultimately interfering with the future steel shipments by the steel-processing plant out of state. The trial court instructed the jury that the interstate-commerce element of the offense could be fulfilled if the jury found that Stirone’s acts interfered with either the Pennsylvania company’s importation of sand or with the future exportation of steel by the steel-processing plant.
The United States Supreme Court reversed Stirone’s conviction on the ground that the trial court’s jury instruction constructively amended the indictment to charge a new and different offense than that contemplated by the indictment returned by the grand jury and that such an amendment could not be harmless error. The Court explained:
“Ever since Ex parte Bain, 121 U.S. 1, was decided in 1887, it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself In that case, the court ordered that some specific and relevant allegations the grand jury had charged be stricken from the indictment so that Bain might be convicted without proof of those particular allegations. In holding that this could not be done, Mr. Justice Miller, speaking for the Court, said:
“ ‘If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner’s trial for a crime, and without which the constitution says “no person shall be held to answer,” may be frittered away until its value is almost destroyed.’ 121 U.S. 1, 10, 7 S.Ct. 781, 786.
“The Court went on to hold in Bain: ‘that after the indictment was changed it was no longer the indictment of the grand jury who presented it. Any other doctrine would place the rights of the citizen, which were intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney....’ 121 U.S. 1, 13, 7 S.Ct. 781, 787.
“The Bain case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. See also United States v. Norris, 281 U.S. 619, 622 [(1930)]; Cf. Clyatt v. United States, 197 U.S. 207, 219, 220 [ (1905) ]. Yet the court did permit that in this case. The indictment here cannot fairly be read as charging interference with
*1277 movements of steel from Pennsylvania to other States nor does the Court of Appeals appear to have so read it. The grand jury which found this indictment was satisfied to charge that Stirone’s conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that Stirone’s conduct would interfere ■with interstate exportation of steel from a mill later to be built with Rider’s concrete. And it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned. Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition charging interference with steel exports here is neither trivial, useless, nor innocuous. Compare Ford v. United States, 273 U.S. 593, 602 [ (1927) ]; Goto v. Lane, 265 U.S. 393, 402 [ (1924) ]. While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant’s substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error. Compare Berger v. United States, 295 U.S. 78 [ (1935) ]. The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. Thus the basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge.
“Here, as the trial court charged the jury, there are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government’s jurisdiction of this crime rests only on that interference. It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened. The right to have the grand jury make the charge an its own judgment is a substantial right which cannot be taken away with or without court amendment. Here, as in the Bain case, we cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. Yet because of the court’s admission of evidence and under its charge this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him. This was fatal error. Cf. Cole v. State of Arkansas, 333 U.S. 196 [ (1948) ]; De Jonge v. State of Oregon, 299 U.S. 353 [ (1937) ].”
361 U.S. at 215-19 (emphasis added; footnotes omitted).
*1278 In Brooks, supra, this Court faced a jury-instruction amendment to an indictment for capital murder during a robbery. The evidence in Brooks indicated that Brooks and his codefendant entered the home of Forest Bowyer and his 12-year-old son, Brett, kidnapped Forest and Brett, drove the two to a remote location, questioned Forest about the whereabouts of a safe, drove the two back to their house where they got money and a gun, and then drove the two back to the remote location where Brooks and his codefendant murdered Brett by shooting him in the head and attempted to murder Forest by cutting his throat. Brooks was indicted for the capital murder of Brett Bowyer during the course of robbing Forest Bow-yer.[6] The language in the indictment specifically charged that Brooks murdered Brett during the time that he was in the course of committing a theft of money “ ‘by the use of force against the person of Forest F. Bowyer, with intent to overcome his physical resistance or physical power of resistance.’ ” 973 So.2d at 401 (emphasis omitted). The trial court, however, instructed the jury that it could find Brooks guilty of capital murder if it found that Brooks had murdered Brett and had “ ‘either used force or threatened the imminent use of force against a person, William Brett Bowyer, with the intent to overcome his physical resistance or physical power to resist.’ ” 973 So.2d at 402 (emphasis omitted).
This Court held that the trial court’s jury instruction had constructively amended the indictment, that the amendment charged a new or different offense in violation of Rule 13.5(a), Ala. R.Crim. P., and that the amendment rose to the level of plain error and was not harmless. We explained:
“The evidence here ... undisputedly showed two separate and distinct robberies against two different victims— one against Forest Bowyer and one against Brett Bowyer. Because two victims were involved, Brooks could have been charged and convicted separately for two counts of capital murder during a robbery — murder during the course of robbing Forest Bowyer and murder during the course of robbing Brett Bowyer. Because Brooks could have been charged and convicted separately for two counts of capital murder during a robbery based on the two separate robberies, we must conclude that the trial court’s jury instructions constituted an amendment to the capital-murder-during-a-robbery indictment, which changed the robbery from the robbery of Forest Bowyer to the robbery of Brett Bowyer and, thus, charged a new or different offense not contemplated by the original indictment, running afoul of Rule 13.5, Ala. R.Crim. P.
“In its brief on application for rehearing, the State argues that the trial court read the indictment to the jury during its preliminary instructions and that the presentation of the evidence at trial was premised solely on the fact that Forest Bowyer was the victim of the robbery. Thus, the State concludes, the trial court’s inadvertent ‘slip of the tongue’ did not serve to amend the indictment and, at most, was harmless error. (State’s brief on rehearing, p. 4.) We acknowledge that the trial court read the indictment to the jury; however, it did so before voir dire examination, on February 2, 2004, seven days before the *1279 trial court’s final guilt-phase instructions were given on February 9, 2004. We also agree that the evidence in this case undoubtedly established that Forest Bowyer was robbed; however, as noted, the evidence also established that Brett Bowyer was robbed. In addition, at no time during opening or closing statements did the prosecutor specifically focus on Forest Bowyer as the victim of the robbery underlying the capital-murder charge; rather, the prosecutor referred to ‘them,’ meaning both Forest Bowyer and Brett Bowyer, as victims of the robbery. (R. 1552; 1556; 1570.)9 Moreover, Brooks was indicted for the robbery of Forest Bowyer independent of the capital-murder charge. Therefore, we cannot agree that the State’s presentation of its case was premised solely on the fact that Forest Bowyer was the victim of the robbery underlying the capital-murder charge.
“We also cannot assume that the jurors remembered, seven days later, the specific wording of the indictment charging capital murder during a robbery as it was read to them before voir dire examination, at the same time that the other six charges were also read to them, and that they understood, based on those seven-day-old instructions and in light of the ambiguity in the State’s presentation of its case, that Brooks was charged with capital murder during the robbery of Forest Bowyer, as opposed to capital murder during the robbery of Brett Bowyer as the trial court instructed them just before deliberations. To do so would not only strain credulity, but would require us to presume that the jurors disregarded the trial court’s final guilt-phase instructions. It is well settled that jurors are presumed to follow, not disregard, the trial court’s instructions. See, e.g., Stephens v. State, [982] So.2d [1110, 1130] (Ala.Crim.App.2005) (‘Jurors are presumed to follow the judge’s instructions.’); Minor v. State, 914 So.2d 372, 418 (Ala.Crim.App.2004) (‘Jurors are presumed to follow their instructions.’); Peraita v. State, 897 So.2d 1161, 1204 (Ala.Crim.App.2003) (“‘Jurors are presumed to follow the trial court’s instructions.” ’), aff'd, 897 So.2d 1227 (Ala.2004), quoting Bryant v. State, 727 So.2d 870, 874-75 (Ala.Crim.App.1998); Centobie v. State, 861 So.2d 1111, 1135 (Ala.Crim.App.2001) (‘ “Jurors are presumed to follow the instructions of the trial court.” ’), quoting Griffin v. State, 790 So.2d 267, 334 (Ala.Crim.App.1999), rev’d on other grounds, 790 So.2d 351 (Ala.2000); and Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998) (‘Jurors are presumed to follow the court’s instructions.’), aff'd, 827 So.2d 193 (Ala.2000). Under the circumstances in this case, we must presume that the jurors followed the trial court’s instructions regarding the charge of murder made capital because it was committed during a robbery and found, as instructed by the court, that Brooks murdered Brett Bowyer during the course of robbing Brett, not during the course of robbing Forest Bowyer as charged in the indictment.
“The State’s reliance on United States v. Andrews, 850 F.2d 1557 (11th Cir.1988), is misplaced. In Andrews, Sylvester Andrews was charged with conspiring with his codefendant Robert Ford to distribute cocaine. In its instructions to the jury, the trial court gave a standard instruction on conspiracy law, including the following statements:
“ ‘ “In order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people named in the indictment were members of the scheme or that those *1280 who were members had entered into any formal type of agreement.
“ ‘ “... What the evidence in the case must show beyond a reasonable doubt is, first, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment; ...
[[Image here]]
“ ‘ “Now, a government agent, such as a confidential source or a police officer, cannot be a co-conspirator inasmuch as he is working for the government. Accordingly, in order to find one or both of the defendants guilty of the crime of conspiracy, you must find that each of them conspired with someone other than a government agent.” ’
“850 F.2d at 1559. In holding that these isolated comments did not amend the indictment, the United States Court of Appeals for the Eleventh Circuit noted that, during its instructions, the trial court had ‘read the indictment [to the jury] and repeatedly linked the instructions to the indictment’; had ‘described the crime of conspiracy in terms of the “defendants” — namely, Ford and Andrews — and not just “persons” ’; and had ‘instructed [the jury] that it “must follow all of [the court’s] instructions as a whole. You may not single out or disregard any of the Court’s instructions on the law.” ’ 850 F.2d at 1559 (footnotes omitted). The Court also noted that the only evidence presented at trial was that Andrews and Ford had conspired together and that the government had not shown nor argued that any other persons were involved. In this case, however, unlike in Andrews, the trial court did not read the indictment to the jury during its final guilt-phase instructions, but did so seven days earlier before voir dire examination, nor did the court at any time link its instructions to the indictment. In addition, as noted above, there was evidence presented of a robbery of Brett Bowyer in addition to evidence of a robbery of Forest Bowyer and at no time did the prosecutor specifically argue that Forest Bowyer was the victim of the robbery underlying the capital-murder charge.
“Williams v. State, 701 So.2d 832 (Ala.Crim.App.1997), is more akin to this case than is Andrews. Williams was indicted for robbing Christopher Rashon Love and Eric Alexander; however, in its jury instructions, the trial court instructed the jury that it could find Williams guilty if it found that Williams had robbed Christopher Rashon Love or Eric Alexander. In reversing Williams’s conviction, this Court stated:
“ ‘ “The trial court has a mandatory duty of instructing the jury orally as to the different and distinguishing elements of the offense charged.” Davidson v. State, 360 So.2d 728, 730 (Ala.Cr.App.), cert. denied, 360 So.2d 731 (Ala.1978). It is clear that in order for the jury to convict Williams of the offense charged in the indictment, the jury would have to have found him guilty of robbing both alleged victims. See Dobyne v. State, 672 So.2d 1319, 1341 (Ala.Cr.App.1994), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571 (1996); Styles v. State, 474 So.2d 185, 188 (Ala.Cr.App.1985). It is equally clear that if the jury followed the trial court’s instruction, it could have found Williams guilty based on the robbery of either of the alleged victims. In Styles v. State, supra, the trial court explained to the jury that an indictment conjunctively alleging crimes against two victims should *1281 have alleged the crimes disjunctively in the alternative. The court’s instruction effectively amended the indictment, so that instead of alleging crimes against A and B, the indictment alleged crimes against A and/or B. We noted in Styles that actual prejudice was shown when the trial court’s polling of the jury indicated that the conviction was actually based on a crime against just one of the victims; we believe that sufficient prejudice has also been demonstrated in the instant case. The record reveals that only one of the alleged victims in the instant case, Eric Alexander, actually testified at trial. The trial court’s instruction that Williams could he found guilty on proof of fewer facts than alleged in the indictment was improper and unduly prejudiced Williams’s substantial rights.
“ ‘In the instant case, the State could properly have chosen to seek indictments on two separate counts of robbery in the first degree. By charging conjunctively the robbery of both victims, the indictment required proof of both robberies in order for the jury to reach a guilty verdict. The trial court’s instruction that only proof of the robbery of either of the alleged victims was necessary to sustain a guilty verdict was reversible error.’
“701 So.2d at 883-34 (some emphasis added [in Brooks ]).[7]
“The circumstances in this case are even more compelling than those in Williams. The indictment against 'Williams put him on notice that he was expected to defend against the robbery of both victims, but the jury-instruction amendment reduced the charge to just one victim. Here, however, the jury-instruction amendment did not merely narrow the allegations in the indictment, but actually changed the offense for which Brooks was indicted — capital murder during the robbery of Forest Bow-yer — to an offense for which Brooks had never been indicted and had never received notice that he was expected to defend against- — capital murder during the robbery of Brett Bowyer. In other words, Brooks was convicted of an offense for which he had not been properly charged. ‘Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.’ Stirone v. United States, 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Thus, we conclude that the jury-instruction amendment in this case constitutes plain error.
*1282 [[Image here]]
" 9 Even when arguing the elements of capital murder during a robbery, the prosecutor did not specifically delineate who was the victim of the robbery, but implied that Brett Bowyer was the victim. The prosecutor stated: 'If you use force against a person to overcome their resistance, and you’re armed with a deadly weapon or a dangerous instrument or you cause an injury, you're guilty of robbery. Did they use force? Yes; deadly force. Did they cause injury? Of course.’ (R. 1573; emphasis added.)”
Brooks, 973 So.2d at 408-11.
The evidence here, as in Brooks, supra, undoubtedly established multiple robberies. A robbery is committed when someone commits or attempts to commit a theft of property, and during that commission or attempt, the person uses force against either the owner of the property or another person present. Both the owner of the property, Conaway, and at least one other person, Belser, were present when McKinnis, repeatedly firing his weapon, walked across the street to the club, entered the club, and attempted to steal money from the cash register. McKinnis clearly committed robberies against both Conaway and Belser, by using force against them while attempting to steal money, and he could have been charged and convicted separately for two counts of capital murder during a robbery — murder during the course of robbing Conaway and murder during the course of robbing Belser. Because McKinnis could have been charged and convicted separately for two counts of capital murder during a robbery based on the two separate robberies of Conaway and Belser, but he was indicted for only one of those robberies — the robbery of Cona-way — the trial court’s instructions to the jury that it could find McKinnis guilty of capital murder during a robbery if it found that McKinnis robbed either Conaway or Belser, improperly amended the indictment to add an additional charge not contemplated by the original indictment — the robbery of Belser — and clearly violated the prohibition in Rule 13.5(a), Ala. R.Crim. P.
Moreover, we cannot say that the trial court’s error in this case was harmless. As in Brooks, the record here reflects that the State’s case at the guilt phase of the trial was not presented in such a fashion as to specifically distinguish Conaway as the victim of the robbery charged and Belser as the victim of the murder charged. Rather, throughout the trial, the prosecutor referred to Belser as the victim of the crime generally and to Conaway simply as the owner of the club. Indeed, the focus of the State’s case was on McKinnis’s intent to kill, not on the robbery element of the crime.[8] In addition, although the trial court did read the indictment to the jury once at the beginning of its initial oral charge (it did not reread the indictment when it recharged the jury), this fact alone does not render the trial court’s error harmless. The reading of the indictment occurred at the beginning of the court’s oral charge, and, immediately following the reading of the indictment, the court instructed the jury that the indictment “should not be considered by you as any evidence or any circumstance against him” and that the indictment was “merely the method by *1283 which the defendant in any case is brought before the jury.” (R. 1031.) The court then instructed the jury on five different areas of law before eventually instructing the jury on the elements of capital murder. At no point did the trial court specifically link its instructions to the factual allegations of the indictment, as was the case in United States v. Andrews, 850 F.2d 1557 (11th Cir.1988). The trial court here also made the same error not once, but twice. Both during its initial oral charge and again when recharging the jury, the trial court told the jury that it could find McKinnis guilty of capital murder if it found either that McKinnis robbed Cona-way or that McKinnis robbed Belser. Thus, we cannot say that the trial court’s jury-instruction amendment was simply a “slip of the tongue” that was overlooked by the jury. As noted in Brooks, supra, “jurors are presumed to follow, not disregard, the trial court’s instructions.” 973 So.2d at 409.
The grand jury did not indict McKinnis for the robbery of Belser, and McKinnis received no notice that he was expected to defend against the robbery of Belser. Yet because of the trial court’s instructions, the jury was permitted to convict McKin-nis of a crime for which he was never indicted — the murder of Belser during the robbery of Belser. As the United States .Supreme Court held in Stirone: “[T]he addition charging [a new offense] is neither trivial, useless, or innocuous” because it “destroy[s a] defendant’s substantial right to be tried only on charges presented in an indictment returned by a grand jury.” Stirone, 361 U.S. at 217 (emphasis added). “Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.” Id. The trial court’s jury-instruction amendment here adversely affected McKinnis’s substantial rights and had an unfair prejudicial impact on the jury’s deliberations. See Brooks, supra. Therefore, it constituted plain error and requires reversal of McKinnis’s conviction and sentence.
Based on the foregoing, the judgment of the trial court is reversed and this cause remanded for a new trial.
REVERSED AND REMANDED.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. Excerpts of the video from the surveillance system the night of the shooting were introduced into evidence at trial and played for the jury.

. At the time, Alabama law prohibited persons under the age of 21 from being present in an establishment where alcoholic beverages were sold.

. The reading of the indictment was not transcribed. The record merely contains a notation that “the indictment was read by the Court.” (R. 1031.)

. The jury was instructed on the lesser-included offenses of intentional murder, reckless murder, and felony murder.

. Ex parte Seymour overruled Ash only to the extent that Ash held that an indictment is the source of a trial court's subject-matter jurisdiction.

. Brooks was also indicted for, and found guilty of, three additional counts of capital murder: murder made capital because it was committed during a kidnapping, murder made capital because it was committed during a burglary, and murder made capital because the victim was a child less than 14 years of age.

. The amendment in Williams v. State, 701 So.2d 832 (Ala.Crim.App.1997), did not change the offense charged, but changed only the conjunction between the two charged robberies. The amendment, just as the original indictment, put Williams on notice that he was expected to defend against two robberies, against both Love and Alexander, and did not impair Williams’s ability to plead the judgment in bar to a second prosecution for the robbery of either Love or Alexander. Therefore, the amendment did not violate the prohibition in Rule 13.5(a) against amending an indictment to charge a new or different offense. See Ash, 843 So.2d at 217. This Court’s holding was premised on the prejudice to Williams’s substantial rights under Rule 13.5(c)(2), Ala. R.Crim. P. (“No charge shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, for any defect or imperfection in the charge which does not tend to prejudice the substantial rights of the defendant upon the merits.”). Specifically, the amendment was prejudicial because it allowed Williams to “be found guilty on proof of fewer facts than alleged in the indictment.” Williams, 701 So.2d at 833. See also Styles v. State, 474 So.2d 185 (Ala.Crim.App.1985).

. Although during opening statements the prosecutor did request that the jury find McKinnis guilty of capital murder, specifically "of the robbery in this case, of robbing the Champagne Lounge, the property of Michael Conaway” (R. 223), this statement is clearly incorrect because it referred to the club itself as the victim of the robbery, not Conaway. As noted above, robbery is a crime against the person, not against a place. We cannot say that this single, incorrect statement by the prosecutor in any way suggested to the jury that Conaway was the victim of the robbery.