Rel: February 6, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

## CR-2022-1044

_____

## Warren Terrell Hardy

### v.

## State of Alabama

## Appeal from Madison Circuit Court
## (CC-17-3357)

COLE, Judge.

Warren Terrell Hardy was convicted of the capital murder of Kathleen Lundy during a robbery, a violation of § 13A-5-40(a)(2), Ala. Code 1975. Hardy was also convicted of two counts of first-degree kidnapping, violations of § 13A-6-43, Ala. Code 1975, for the kidnapping

of Warren Bradford and his granddaughter Kalen Holtcamp, one count of first-degree domestic violence based on the aggravated stalking of Jessica Holtcamp, a violation of § 13A-6-130(a)(1), Ala. Code 1975, and one count of discharging a firearm into an occupied vehicle, a violation of § 13A-11-61(b), Ala. Code 1975. After unanimously finding the existence of two aggravating circumstances, see §§ 13A-5-49(3) and 13A-5-49(4), Ala. Code 1975, the jury recommended by a vote of 11-1 that Hardy be sentenced to death for the capital murder of Kathleen Lundy. The Madison Circuit Court followed the jury's recommendation and imposed a death sentence for the capital offense. The trial court sentenced Hardy to 99 years' imprisonment for each of his first-degree-kidnapping convictions and for his first-degree-domestic-violence conviction and to 20 years' imprisonment for his discharging-a-firearm-into-an-occupied-vehicle conviction. (C. 553-54.) All the sentences were ordered to run concurrently.

<u>Facts</u>

The following evidence was presented at Hardy's trial.

Jessica Holtcamp and Hardy began dating in 2014. In February 2015, Jessica began renting an apartment, and Hardy moved in with her.

Jessica testified that, after he moved in with her, Hardy began to become angrier, more controlling, and more physical and would grab her arms and shake her "really hard." (R. 1077.) According to Jessica, Hardy's conduct escalated and, in late July 2016, Hardy "straddled" her and "began to choke" her, prompting Jessica and her six-year-old daughter Kalen to move in with Jessica's mother before moving into a new apartment. (R. 1074, 1081, 1107.) Jessica also changed her cellular-telephone number, but Hardy still had access to her text messages and emails through their previously shared Verizon telephone-service plan. Hardy also repeatedly called and texted Jessica, and he threatened to release "inappropriate" pictures of Jessica, who was an elementary-school teacher, "to the news stations" and to her school principal. (R. 1082-83.)

On August 24, 2016, as Jessica was leaving work, Hardy pulled up next to Jessica in his vehicle "very angry, yelling profanities, asking [her] to pull over." (R. 1084.) Jessica attempted to "lose" Hardy, but he followed her to her daughter's school. Jessica drove away, and Hardy continued to pursue her to a red light, at which point he got out of his car and began walking toward Jessica's car. Jessica "laid on [her] horn and

ran the red light" and then drove to the South Huntsville Police precinct and ran into the building. (R. 1085-86.) Jessica testified that Hardy also ran the red light and followed her into the parking lot, but he did not follow her inside the precinct. Jessica told a police officer that she had filed a petition for a protection-from-abuse order and that an ex parte protection order had been issued that day. The order, which was admitted at trial, prohibited Hardy from harassing, stalking, annoying, or threatening Jessica or from engaging in conduct that would place her in reasonable fear of bodily injury. It also prohibited Hardy from going within 300 hundred feet of her residence or place of employment. Jessica testified that Hardy had told her: "If you ever try to call the police on me or go to the hospital, I will kill you and your entire family." (R. 1147.)

Lt. Ronnie Dickey saw Jessica at the police precinct that day and testified that she was "pretty frantic," "crying," "scared," and "shaking real bad" and was saying: " He's trying to get me." (R. 1160-61.) Lt. Dickey went outside and talked to Hardy. Lt. Dickey told Hardy that Jessica said she had a protection order but, because Hardy had not been served yet, there would be no arrest at that time; however, Lt. Dickey instructed Hardy to "stay away from her." (R. 1161.)

4

Previously, on August 22, 2016, Hardy purchased a Hi-Point .40 caliber semiautomatic handgun and a stun gun. Two days after Hardy chased Jessica to the precinct, on August 26, 2016, Hardy went to a local firing range to practice shooting his new handgun. Hardy admitted that, after his target practice, he went to Jessica's apartment to wait for her and hid in her daughter Kalen's closet when he heard the apartment door opening. (State's Exhibit 131; R. 1403-04.) Warren Bradford, Jessica's stepfather and Kalen's grandfather, had picked Kalen up from school and taken Kalen back to Jessica's apartment. Bradford testified that, when he and Kalen entered her bedroom, "Hardy came running through the [closet] door and knocked [him] down" with a "hard push." (R. 1176, 1195.) Bradford said that Hardy had a gun in his hand and told Bradford to "'do what I tell you to do or I'm going to shoot you.'" (R. 1176.) Hardy instructed Bradford to tell Jessica to meet him and Kalen at Bradford's father's home in a gated neighborhood. When Bradford initially refused, Hardy pulled out his stun gun and shocked Bradford with it, warning him repeatedly, "'do what I tell you to do or I'll shoot you.'" (R. 1178.) Bradford testified that Hardy also said that he had "four bullets" in his gun and indicated that he would not be alive "much longer" or "after

5

today." Bradford believed that Hardy was going to "kill us and, definitely … kill Jessica." (R. 1180.) Nonetheless, Bradford was forced by Hardy to call Jessica and tell her to meet them at his father's house. According to Bradford, en route to his father's house, Hardy kept the gun in his lap while sitting in the front passenger seat and told Bradford not to attract any attention from anyone or "he would shoot." (R. 1181.) When they got to Bradford's father's house, Hardy instructed Bradford to pull next to Jessica's car and then told Jessica to get in Bradford's car. Instead, Jessica began trying to get Kalen out of the car. Hardy pushed Jessica into the car, and Bradford put the car in reverse and "punched it," knocking Hardy down, and Bradford just "kept going" straight through the neighborhood gate to escape Hardy while Jessica called emergency 911.

Jessica also testified about the events of August 26, 2016, explaining that, per Bradford's request, she was sitting in her car waiting for Bradford and Kalen at Bradford's father's house. When they pulled up to her car, Hardy was there and told her to "get into the car." (R. 1088-90.) "[F]earful for [her] child," Jessica got out of her car and went to grab Kalen out of Bradford's back passenger seat, but Hardy got out and told

Jessica to "get in the car," showing her his gun. (R. 1091, 1116-18.) Kalen screamed, and Jessica "jumped in on top of her." (R. 1091.) At that point, Bradford "put the car in reverse, and the front passenger door knocked [Hardy] down," and Bradford drove through the gate to the neighborhood. (R. 1092.)

As this was happening outside, Rusty Lundy was in his living room "watching cartoons with [his five-year-old] granddaughter" while his 72-year-old wife, Kathleen Lundy was preparing to take a large tray of food to a neighborhood party. (R. 704, 1049.) Rusty Lundy got up to open the door for Kathleen Lundy because her hands were full and he "saw a man coming up." (R. 1051, 1056.) Rusty Lundy asked "'Can I help you?'" but realized the man was angry and "walking towards the house with a gun and demanding the keys to our car"; "within seconds," Hardy was on the Lundys' front porch. (R. 1051, 1058.) Hardy "grabbed [the 5'3" Kathleen Lundy] around the neck, pulled her into his chest" and pointed the gun at Rusty Lundy. (R. 1051-52.) Rusty Lundy told Hardy: "'The keys are right here next to me on this red sideboard [about two feet from the door]. All I need to do is get them for you.'" (R. 1052. 1060.) Rusty Lundy had his back to Hardy "two seconds" while Kathleen Lundy, who, he said, was

7

not struggling, was "scared to death ... crying" and not moving. (R. 1062-63.) Rusty Lundy "picked up the keys, and ... turned to hand [them] to [Hardy]; the gun moved ... to [Kathleen Lundy]," and a "very angry" Hardy "said something to the effect of 'I said hurry'" and then "shot [Kathleen Lundy] and shoved her into the house." (R. 1052, 1060.) Rusty Lundy "tried to catch [his] wife [to prevent her] from hitting the floor" and "started calling 911" while Hardy left in the Lundys' white Lexus automobile. (R. 1052-53.) There was so much blood everywhere that Rusty Lundy could not find where his wife Kathleen Lundy had been shot, but he began to administer CPR.

Jessica testified that, "[w]ithin one to two minutes" of their bursting through the neighborhood gate to escape Hardy, a "white Lexus pull[ed] up next to" them. (R. 1093.) According to Jessica, Hardy was "driving the wrong way on the road" and pulled up parallel to them and fired at least three shots into their vehicle and continued chasing them as they made "multiple loops and turn-arounds in and out of traffic in different areas." (R. 1093-94, 1133.) Like Jessica, Bradford testified that he thought they were "clear" of Hardy when they exited the neighborhood, but, "[a]ll of a sudden," Bradford stated, he saw Hardy "flying towards

8

us," pull up "right next to us," and stick "his gun out." (R. 1186.) According to Bradford, it was "bumper-to-bumper traffic like rush hour traffic," so he had to flee off the road into the grass, but Hardy kept pulling up beside them and fired at least three shots at them while Bradford drove straight into oncoming traffic with his emergency lights on, blowing his horn, and making multiple turns to escape Hardy. (R. 1186-88.)

Huntsville Police Department Inv. Chris Hines met Bradford, Jessica, and Kalen at a gas station and interviewed Bradford, Jessica, and then Rusty Lundy, and he put out a be-on-the-lookout, "BOLO," for Hardy's silver SUV because Hardy had already abandoned the Lundys' white Lexus. Jessica told Inv. Hines that she would visit her family just outside Jasper, Tennessee, if she needed a place to "hide out," so local authorities were notified that Hardy might go there next.

As expected, on the morning of August 28, 2016, Hardy was seen driving his silver SUV by Jasper, Tennessee, Police Officer Tyrone Green. Officer Green began a high-speed pursuit of Hardy, which ended in Hardy crashing his vehicle and being taken into custody a few minutes later by Sgt. Matt Blansett of the Marion County Sheriff's Department.

9

Sgt. Blansett testified that he came upon Hardy, who had a firearm in his hand, abandoning his wrecked vehicle and walking across a yard near Jessica's family's house around 9:00 a.m. Sgt. Blansett took Hardy and the firearm into custody.

Inv. Hines went to Tennessee, Mirandized[1] Hardy, and made a video recording of Hardy's interview, State's Exhibit 131, which was admitted and played for the jury. At the outset, Hardy claimed that "the shooting was a complete accident" and happened in the "heat of the moment." Hardy admitted, however, that he "asked the lady for her keys ['several times'], and she didn't want to give them to [him]" and that he "nudged her" and then his gun just "went off." But, Hardy contended, "I did it, but it definitely wasn't intentional." Hardy later explained that, after Bradford drove off, he simply wanted to follow Jessica, but there were no keys inside Jessica's car, which was why he had asked "the lady" and "her husband" for car keys. Hardy admitted that his gun was pulled "as a scare tactic" and that he told the Lundys that he "did not have time for this shit, just give me the keys." Nonetheless, Hardy insisted that the gun "went off" by accident, that he "never wanted to use it," and that he

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).

"never wanted to kill anyone." (R. 1406.) Hardy also acknowledged during his interview that he had repeatedly tried to contact Jessica and that he knew about the protection order.

Inv. Lisa Hamilton collected and photographed evidence in the case. She testified that, at the Lundys' home, there was a .40 caliber shell casing, a fired bullet that "pierced the threshold," a tray and spilled food, and a large amount of blood. Furthermore, Bradford's vehicle had at least three bullet holes in different parts of the car. A fragmented bullet was found in Bradford's driver's door. There was also damage to the rear of Bradford's vehicle from where he had crashed through the gate while fleeing Hardy. Inside the Lundys' abandoned white Lexus, a .40 caliber shell casing was found on the floorboard. Inside Hardy's vehicle, which was recovered in Tennessee, there were eight cartridges in a .40 caliber magazine, a black bra, a picture of Jessica, a stun gun, and a receipt for the stun gun, which was "made to look like a cell phone," a wig, two knives, a red backpack, a roll of duct tape, an empty .40 caliber Smith & Wesson cardboard box, and money inside an envelope, which had "For Khloe" (Hardy's daughter) written on it. (R. 1230-40, 1275-80.)

11

Inv. Brad Arnette, an expert in digital forensics employed by the Madison County District Attorney's Office, conducted a data extraction on Hardy's cellular telephone and located two pertinent multimedia messages. Inv. Arnette read the first of those messages to the jury:

"In case something goes wrong, I want you to know I would never do a thing to hurt you, not intentionally. I love you more than anything else, and this is why today is my final day on this planet. The only thing that can save me is you. I can't live another day without you. I have lost everything. Hope for us is all that keeps us alive. I hope that you realize how much I do love you, and no matter what anyone has said, I will have your back until I can no longer have it. I love you to the moon and the stars. No one will ever have me like you do. I hope you choose me, even if it's for a short time, so I can slowly come off you if nothing else. But that's not good enough for me, and I'm sure you don't want that. I'm sorry. I'm a broken record. I just don't know what to do without you. Khloe has everything I have, but you have everything I am. It's not a lot more I want to say, but this should do in case I have to pull the trigger. I love you Jessie, always and forever. I love you, Jessica Joyce Holtcamp. If you have gotten this, it means two things: 1, you never showed, so I went to a new location and ended it or, 2, you don't give me a chance to talk and just ran off so I had to end it. I love you. I hate you couldn't hear your song I wrote. Let's pray this is a dream, and when I wake up at a point, you still love me and remember what I did and know how to fix it. Pray that there is a reset on life that lets you try again. The location of my truck is on the other side of the wood gate behind The Meadows. You can take the sidewalk by your apartment and make a right once you pass it. It's close to the cul de sac. My key is in your top drawer under the TV. Next time you look under at your mother, if she would have stayed out, we would have made it. If your mother would have talked to both of us,

I would be alive. Help my mother, please. Drive her and tell her. ... She will need you. It will kill her. Save her...."

(R. 1343-44.) This message was not "sent" but was saved in a "draft folder."

Inv. Arnette also read the second multimedia message extracted from Hardy's cellular telephone that was sent to Hardy's godmother. The message read:

"I'm in her apartment, and I'm nervous something will go wrong, but I got to do this. Do not call anyone just yet, things may go great. If I don't text you in 30 minutes, then it's okay to call the police. I'm scared and lost, and I have to try to win her back. Now I know this day will end in my death. I know she wants nothing to do with me, so I trust my last will and testament. Tell my mother and sister I love them, and I am sorry. Ask them to move forward with life and put God first. Read the Word. I ask you to help them with that. Everything I have at that house belongs to Brittany. This is Khloe's legacy. Behind The Meadows is my car. It's parked at one of the apartments accessible behind the neighborhood Walmart. Everything inside is Khloe's also. To my family, I love them. Try to do the right thing. To Jessie, I never had a love like yours. I hate things ended this way. I had to prove to you I had changed to the point my life no longer mattered. I love you to the moon, through the stars. I love you more than life itself. There is only once in a man's life he finds something worth dying for, and it's you. I pray that if it doesn't end well, that the higher power will allow me to wake up and it be nothing more than a bad dream. I want nothing more than for us to grow gray together. You are beautiful inside and out. I do not understand what happened, but if it's worth it to you, then it's worth it. If it was worth it to you, my life would be lost instead of we fighting to keep KR, then so it

13

be. It is yours. Tell Khloe I am sorry. I love her more than words can express. I ask you all to watch over my baby. Teach her how to be a responsible woman of the world and how to follow the one true Lord. Thank you for everything, Deborah. I'm sorry I was so weak. I truly do not want to live in a world without my Jessie. I love you all. The location of my truck can be -- this is my final testament here, August 26, 2016. Warren Terrell Hardy, May 19th, 1989."

(R. 1344-45.) The second message was sent at 2:59 p.m. on August 26, 2016.

The State rested, and Hardy moved for a judgment of acquittal on all but the kidnapping charges. Hardy's motion was denied.

In his defense, Hardy called Dr. Wilkie Wilson, a neuropharmacologist expert, who testified that Hardy had been in the Huntsville Hospital on August 25th and 26th before he left the hospital against medical advice.[2] Hardy had self-reported that he had attempted to commit suicide by hanging himself, but, according to hospital records, Hardy later acknowledged making the story up to get his girlfriend's sympathy. Hardy was prescribed both an antipsychotic medicine and a calming medicine. Hardy, who was diagnosed with "severe depression," was "angry, agitated, [and] uncooperative" while at the hospital and

---

[2]Hardy had also been in the hospital previously about a month earlier for "extreme depression." (R. 1475-76.)

14

threatened a laboratory technician. Hardy left the hospital around lunchtime on August 26, 2016.

Dr. Jeffrey Neushatz, a cognitive psychologist and memory expert, testified generally about the inaccuracy of memories, particularly during a traumatic event.

Hardy also testified in his own defense. Hardy said that, because his relationship with Jessica ended, he wanted to die and that he had been hospitalized before and had not been taking the prescribed medication. Hardy acknowledged following Jessica from school to the police precinct and admitted that he was aware of the protection order and knew "to just not do anything threatening towards Jessica." (R. 1546-47.) Hardy also acknowledged that he checked out of the hospital around 11:00 a.m. on August 26, 2016, against medical advice. Hardy admitted buying the gun and the stun gun a few days before the crimes but insisted that he was simply hoping that he and Jessica could "shoot targets" together. Hardy also admitted going to the shooting range when he left the hospital and then to Jessica's apartment. Hardy testified that he was suicidal and just wanted to try to get Jessica back. Hardy explained that he had a key to Jessica's apartment and that he always

15

parked "at the neighborhood Walmart across the field next to [Jessica's] apartment complex." (R. 1550-51.) Hardy admitted that he got to Jessica's apartment around "1:00, 2:00" and that he left a note in Kalen's bedroom, sent the text message to his godmother, and saved the draft message for Jessica. Hardy also admitted hiding in Kalen's closet and exiting it when Bradford and Kalen entered her bedroom. Hardy acknowledged that he was upset, but he denied pushing Bradford and taking his gun out of the holster. Hardy said that he wanted to meet Jessica in a gated community and testified that Bradford thought meeting Jessica at Bradford's father's house was "an excellent idea." (R. 1567.) Hardy said that he took the gun out of his holster on the way to meet Jessica only because it was pinching his side. Hardy said that he did not use the stun gun on Bradford that day but that it went off accidentally at one point.

Hardy then attempted to explain what occurred in the gated subdivision. According to Hardy, he was holding the gun because he "caught it" as it was falling out of his lap. Hardy said that he had "no idea" why Bradford had hit him with the car door when he was trying to talk to Jessica and that, when Bradford "floored it" in reverse, the back

16

door hit him like a "sledgehammer" and Bradford, Jessica, and Kalen drove off. (R. 1574-77.) Hardy testified that he jumped inside Jessica's vehicle "to defend [him]self" and "attack back if need be." (R. 1577.) Hardy testified that he "needed to fight back." (R. 1578-79.) So, because Jessica's keys were not in her car, Hardy shouted at Kathleen Lundy for her car keys. Hardy said that Kathleen Lundy then hit him "a few times," which caused him to "lock[] his arm around hers and grab[] her other arm to keep her from continuing" to hit him. (R. 1582.) Hardy testified that during his "struggle" to stop Kathleen Lundy from hitting him, the gun somehow went off, but he did not pull the trigger. Hardy said that he "tried to catch her" as she "she slid[] through [his] hand" but that Rusty Lundy threw the car keys at him and told him to leave. (R. 1586-87.) Hardy admitted "rushing" Kathleen Lundy and saying "I don't have time for this shit" before catching the keys that Rusty Lundy threw at him and leaving in the Lundys' white Lexus. (R. 1588.) But, Hardy insisted that he did not mean to shoot Kathleen Lundy and that he did not intend to cause her harm.

Hardy also admitted catching up to Bradford, Kalen, and Jessica and firing three shots into the door of Bradford's vehicle, although he said

17

that he was "making sure not to hit the window" and fired only because he "felt like [Bradford] was about to try to ram into [him]." (R. 1589, 1614.) Hardy said that he eventually abandoned his pursuit of Jessica, her child, and her stepfather, abandoned the Lundys' Lexus, and got into his own SUV.

The defense rested and moved for a judgment of acquittal on all charges. That motion was also denied.

On April 14, 2022, the jury found Hardy guilty of all five offenses, including the capital murder of Kathleen Lundy during a robbery. The trial court adjudicated Hardy guilty of all five charged offenses, and the penalty phase began the same day. The trial court noted that one aggravating circumstance had already been unanimously proven beyond a reasonable doubt based on the guilty verdict, but the State proffered two additional aggravating circumstances -- that Hardy knowingly created a great risk of death to many persons and that the capital offense was especially heinous, atrocious, or cruel. Hardy's counsel proffered multiple mitigating circumstances. In recommending a death sentence, the jury also returned special-verdict forms unanimously finding beyond a reasonable doubt that Hardy committed capital murder during a

18

robbery and that Hardy knowingly created a great risk of death to many people. The jury also returned a special-verdict form finding that the State had not proven that the capital offense was especially heinous, atrocious, or cruel. (C. 438-39; R. 1924.)

On August 22, 2022, Hardy moved for a new trial, arguing that the trial court had erred by denying his challenge pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), that the verdict was contrary to the weight of the evidence, that the trial court had improperly allowed evidence of prior bad acts regarding his alleged abuse of Jessica, that the State had improperly argued that the victim impact outweighed the proffered mitigating circumstances, and that there was no evidence indicating that Hardy had created a great risk of death to more than two victims during the robbery. The trial court denied this motion.

After ordering a presentence-investigation report, the trial court conducted its own sentencing hearing on August 25, 2022. The trial court followed the jury's recommendation and sentenced Hardy to death for the capital murder of Kathleen Lundy. The trial court also sentenced Hardy to 99 years' imprisonment for each count of first-degree kidnapping, to 99 years' imprisonment for first-degree domestic violence, and to 20 years'

imprisonment for discharging a firearm into an occupied vehicle. All the sentences were ordered to run concurrently. This appeal follows.

Discussion

Hardy raises 15 claims of error on appeal. We do not address all of those issues relating to Hardy's capital-murder conviction and death sentence. Nor do we address the issues in the order in which they were raised in Hardy's brief because we are reversing Hardy's conviction for capital murder and his resulting death sentence and remanding the case for a new trial because the trial court's instructions to the jury constructively amended Hardy's indictment for capital murder.

Before addressing Hardy's claims, it is also important to note that we do not engage in our discretionary plain-error review[3] of Hardy's claims relating to his capital-murder conviction for which the death penalty was imposed because we are reversing his capital-murder

_____

[3]See, e.g., Mulkey v. State, [Ms. CR-2023-0304, May 2, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025) (recognizing that although the 2023 amendment of Rule 45A, Ala. R. App. P., removed the requirement of plain-error review, this Court stated that it would, in its discretion, continue its plain-error review in cases in which the death penalty has been imposed). But see Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024) (holding that "this Court will no longer review Batson claims under our plain-error standard when those claims are raised for the first time on appeal").

20

conviction and death sentence based on a preserved claim. We further note that our discretionary plain-error review in cases in which the death penalty has been imposed does not extend to Hardy's <u>noncapital</u> convictions and sentences. <u>See, e.g.</u>, <u>Wiggins v. State</u>, 193 So. 3d 765, 775 (Ala. Crim. App. 2014) (recognizing that "a defendant who is convicted of both a capital offense and a noncapital offense, and is appealing those convictions, is not entitled to benefit from the plain-error standard of review on the noncapital conviction").

## I.

Hardy argues that the State used its peremptory strikes to intentionally discriminate against black prospective jurors, specifically, prospective jurors 15, 19, 26, 27, 28, 52, and 62, in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). Hardy then makes the following three specific arguments: (1) that he made a "prima facie case of racial discrimination" (Hardy's brief, p. 23), (2) that "the State provided no reason for the strike [of potential juror 62], and no race-neutral basis for removal was available" (Hardy's brief, p. 27), and (3) that "the State's proffered justifications for striking the other six African-American jurors were pretextual." (Hardy's brief, p. 28.) Hardy is not entitled to relief

21

based on these arguments, which are not preserved for this Court's review, meritless, or both.

As an initial matter, we evaluate Hardy's Batson arguments based on the following well-settled legal principles recently set forth in Iervolino v. State, 402 So. 3d 844 (Ala. Crim. App. 2023):

> "'In evaluating a Batson claim, a three-step process must be followed. See Foster v. Chatman, 578 U.S. [488], 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016); Snyder v. Louisiana, 552 U.S. 472, 476-77, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008); Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); and Batson, 476 U.S. at 96-98, 106 S. Ct. 1712.
>
> > "'"First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson,] 476 U.S. at 96-97[, 106 S. Ct. 1712]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98[, 106 S. Ct. 1712]. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98[, 106 S. Ct. 1712]."
>
> "'Miller-El, 537 U.S. at 328-29, 123 S. Ct. 1029.
>
> > "'When a trial court does not make an express finding that the defendant has established

a prima facie case of discrimination under the first step of the process but the prosecution nonetheless provides reasons for its strikes under the second step of the process, "this Court will review the reasons given and the trial court's ultimate decision on the Batson motion without any determination of whether the moving party met its burden of proving a prima facie case of discrimination." Ex parte Brooks, 695 So. 2d 184, 190 (Ala. 1997). ...

"'"Within the context of Batson, a 'race-neutral' explanation 'means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' Hernandez v. New York, 500 U.S. 352, 360, 111 S. Ct. 1859, 1866, 114 L. Ed. 2d 395 (1991)."

"'Allen v. State, 659 So. 2d 135, 147 (Ala. Crim. App. 1994) (emphasis added). "The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995). ...

"'"Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. [People v.] Wheeler, 22 Cal. 3d [258] at 282, 583

23

P.2d [748] at 763-64, 148 Cal. Rptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:

"'"1. The reasons given are not related to the facts of the case.

"'"2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.

"'"3. Disparate treatment -- persons with the same or similar characteristics as the challenged juror were not struck. ...

"'"4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors. ...

"'"5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire. ...

"'"6. '[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' Slappy [v. State], 503 So. 2d [350] at 355 [(Fla. Dist. Ct. App. 1987)]. For instance, an assumption that teachers as a class are too liberal,

24

> > without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror."

"'Ex parte Branch, 526 So. 2d 609, 624 (Ala. 1987). "'The explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor's other peremptory strikes, and as well, in light of the strength of the prima facie case.'" Ex parte Bird, 594 So. 2d 676, 683 (Ala. 1991) (quoting Gamble v. State, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987)). In other words, all relevant circumstances must be considered in determining whether purposeful discrimination has been shown. See Snyder, 552 U.S. at 478, 128 S. Ct. 1203 ("[I]n reviewing a ruling claimed to be a Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted.").

"'"[T]he critical question in determining whether a [defendant] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" Miller-El, 537 U.S. at 339, 123 S. Ct. 1029 (quoting Purkett, 514 U.S. at 768, 115 S. Ct. 1769). Because "'[t]he trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses,'" Harris v. State, 2 So. 3d 880, 899 (Ala. Crim. App. 2007) (quoting Heard v. State, 584 So. 2d 556, 561 (Ala. Crim. App. 1991)), an appellate court must give deference to a trial court's findings and "'reverse the circuit court's

25

ruling on the <u>Batson</u> motion only if it is "clearly erroneous."'" <u>Johnson v. State</u>, 43 So. 3d 7, 12 (Ala. Crim. App. 2009) (quoting <u>Cooper v. State</u>, 611 So. 2d 460, 463 (Ala. Crim. App. 1992), quoting in turn <u>Jackson v. State</u>, 549 So. 2d 616, 619 (Ala. Crim. App. 1989)).'

"<u>DeBlase v. State</u>, 294 So. 3d 154, 201-02 (Ala. Crim. App. 2018)."

402 So. 3d at 871-72.

After challenges for cause, 45 prospective jurors remained on the venire, 8 of whom were black. Each party had 17 peremptory strikes, with the last 4 strikes serving as alternates, and the State struck 7 of the 8 black prospective jurors,[4] using its 2nd, 3rd, 4th, 5th, 6th, 11th, and 15th strikes to strike black prospective jurors. At the conclusion of the striking process, Hardy made a <u>Batson</u> challenge based on three arguments. First, Hardy alleged that the State struck seven of the eight black prospective jurors who remained after strikes for cause, as well as two other minority prospective jurors. Second, Hardy alleged that the State struck five black prospective jurors in a row -- prospective jurors 15, 19, 26, 27, and 28. Third, Hardy alleged that prospective jurors 49

---

[4]Hardy used a peremptory challenge to strike one of the black prospective jurors, which resulted in no black jurors serving on the jury. (R. 1013.)

and 56, who were both seated as jurors, would have scored higher based on the defense's "scoring system" than prospective jurors 19 and 28, who were struck.

Although the trial court did not expressly state at that time that Hardy had made a prima facie case, the trial court asked whether the State had a "response on the challenge at this point?" (R. 1007.) The State then explained that it struck the prospective jurors in numerical order, except for prospective juror 17, which it "forgot and followed back up" upon realizing the mistake (R. 1007); that prospective juror 15 had no comment on the death penalty on his questionnaire but stated that his overall opinion on it was a "1" (strongly disagree) out of "10" (strongly agree); that prospective juror 19 stated on his questionnaire that he did not "believe in the death penalty" and that he did not "believe that [he] should hold the power" to determine that someone should die, although he did believe everyone should be held accountable (R. 1008); that prospective juror 26 responded "not applicable" to multiple questions on the questionnaire about the death penalty and also indicated that the death penalty was imposed too often and rated his opinion of it a "4" out of "10"; that prospective juror 27 disclosed a DUI conviction, and the

27

State "struck everyone who had a criminal conviction" (R. 1009); that prospective juror 28 stated that he did not "agree with the death penalty unless more than one life was taken," and that he "can't really decide a person's punishment," and that juror 28 was "sleeping during voir dire" (R. 1010); that prospective juror 42 identified as "White/Hispanic," had become "less in favor" of the death penalty in the last decade, and rated himself a "3 on his overall opinion regarding the death penalty" (R. 1011); that prospective juror 52 had a conviction for second-degree possession of marijuana; and that prospective juror 67 was questioned for cause because he had scratched out "no" and then marked "yes" regarding whether he would "automatically vote against" the death penalty, and, although he was rehabilitated such that he could not be struck for cause, the State chose to use a peremptory strike for the same reasons it had made a for-cause challenge. (R. 1012).

After hearing the State's responses, the trial court found that the State had provided "non-discriminatory reasons" for its strikes and asked for Hardy's response. Hardy did not mention that the State had not addressed prospective juror 62; nor did Hardy challenge the race-neutral reasons offered by the State to explain its strikes; rather, Hardy merely

28

reiterated that the State had struck seven of the eight black prospective jurors, as well as a Hispanic prospective juror and an Asian prospective juror. The trial court then asked whether Hardy's counsel had "[a]ny response to the specific non-discriminatory basis that [the State] offered." (R. 1013.) Hardy's counsel, again, did not mention prospective juror 62 but argued generally that "there were other [unnamed] jurors that answered similarly to those that [the State] did offer as non-discriminatory." (R. 1013.) Hardy then specifically cited only prospective juror 56, stating that she "falls in line with several" again unnamed, prospective jurors to which the trial court instructed Hardy:

> "If you have one that you contend is in the same boat as the one that was struck, and the only difference is that they are not a minority, then -- I have to compare apples to apples. So, which apple, out of the bunch that you have identified, are we comparing her to?"

When asked by the trial court to specifically identify any minority prospective jurors who were struck that he believed were similarly situated to prospective juror 56, Hardy identified only three prospective jurors -- prospective jurors 15, 26, and 27 -- abandoning his initial allegation concerning prospective jurors 19 and 28. (R. 1014-16.)

The State explained that, although prospective juror 15 rated himself a "1" out of "10" as to his support of the death penalty, prospective juror 56 rated herself a "5." (R. 1015.) The trial court thus denied Hardy's <u>Batson</u> challenge as to prospective juror 15. The State then explained that prospective juror 26 rated himself a "4" on the death penalty and indicated in his questionnaire that the death penalty was used "too often"; the State also explained that prospective juror 27 had a DUI conviction, and the State had already explained that it struck all prospective jurors with a criminal conviction. When asked for further response, Hardy's counsel stated: "I'm just interested in the Court's ruling." (R. 1017.) The trial court then denied Hardy's <u>Batson</u> challenge as to prospective jurors 26 and 27. Although Hardy had asked the trial court to compare the questionnaire responses of only three prospective black jurors (prospective jurors 15, 26, and 27) to prospective juror 56, and although prospective juror 62 had never been addressed by either party or the trial court after Hardy's initial motion, Hardy made no further argument, stating only: "I'll just renew my objection regarding Jurors number 15, 19, 26, 27, 28, 52, and 62 as all being Black, and 42, Hispanic, and 67, Asian." (R. 1019.) Hardy did not ask the trial court to

30

compare prospective jurors 19 and 28 with prospective juror 56. Hardy also did not ask the trial court to compare any black prospective juror with prospective juror 49. The trial court then noted that "we've looked at explicitly 15, 19, 26, and 27, I believe. … Well, 15, 26, and 27." (C. 1019.) The trial court then expressly asked Hardy: "Do you want to offer any comparison for the other jurors that -- the other strikes that you're objecting to as to 19, 28, 42, 52, and 67?" (R. 1019.) Notably, the trial court again inadvertently failed to mention prospective juror 62, but Hardy, again, did not mention prospective juror 62. Instead, Hardy told the trial court, "we rest on our argument." (R. 1019.) The trial court summarized the <u>Batson</u> hearing, stating that, "under <u>Batson</u> -- <u>we've addressed the specific ones that you raised</u> here. Based on that at this point, I'm not inclined to sustain the Defense's objection on that basis, so I'm denying that." (R. 1019 (emphasis added).) Again, Hardy failed to alert the trial court that prospective juror 62 had not, in fact, been specifically addressed.

The next day, before trial began, Hardy renewed the previous day's <u>Batson</u> challenge, adding that, although Madison County was "39 percent non-White," only "22 out of 80" prospective jurors on the panel were "non-

White" but that, after excuses and strikes for cause, only "[e]ight of the 45 [prospective jurors] were Black, 10 out of the 45 were minorities." (R. 1021.) Hardy also argued that the State used 9 of its 17 strikes to strike minorities and 7 out of 17 strikes to strike black prospective jurors. (R. 1022.) Hardy further argued that "a criminal record is not a race-neutral reason due to the over-policing of minority communities and other factors" and that "the State enjoys benefits, such as the NCIC, that the Defendant ... does not have access to." (R. 1022.) Hardy also cited "Battles v. Huntsville" for the proposition that a "pattern of strikes against Black jurors" is one of the factors that can show purposeful discrimination. (R. 1022-23.) Finally, Hardy pointed out that he now had an "all-White jury." (R. 1023.) Yet, Hardy again failed to mention prospective juror 62 or seek to address prospective juror 62 or any other prospective jurors individually in comparison to any allegedly similarly situated seated juror, including prospective juror 56.

The trial court then found, in pertinent part:

"As I addressed and listened to the challenges, and the response, of course, from the State, I was not only referring to questionnaires being referenced, but I also referred to my trial notes that I kept. I also was referring to the caselaw and treatises on [Batson challenges] as we moved through each phase of that particular challenge.

32

"Initially, after the Defense fully laid out their initial objection, I found that a prima facie case had been made by the Defense, which was Step 1 of that framework. Step 2, … I asked the State to provide a race-neutral explanation for the strikes that were at issue in the challenge. <u>There were race-neutral bases provided by the State</u> at that time, and at that point we transitioned into Step 3, which is to fully assess whether the Defense proved that the State had engaged in a practice of purposeful racial discrimination.

"… I'm well aware of the demographics involved …. Moreover, I have significant, great knowledge of Counsel on both sides here. … <u>I have not had an experience with either side engaging in improper strike practices</u>. …

"I also, in going through and considering all of these various factors, <u>I also considered the multitude of factors that are including but not limited to the characteristics of the jurors in question, pattern of strikes, the past conduct of Prosecution in other cases that I have had with these Prosecutors, the manner of questioning of the witnesses at issue, the disparate treatment of jury members, disparate examination of jurors and the end result of all those strikes.</u> I had all those factors up; I was looking at those as we talked.

"So <u>after considering all of those points of information and authority</u> and, again, with the renewed motion … I'm going to remain consistent with the ruling that I entered yesterday, and <u>I'm going to deny</u> -- overrule <u>that challenge</u>."

(R. 1024-26 (emphasis added).) Hardy then thanked the judge for ruling and, yet again, failed to mention the parties' and the trial court's inadvertently failing to specifically mention or address prospective juror 62 in any <u>Batson</u> discussion during the two days of discussion. Even after

33

the trial court asked if there was anything else to address before opening statements, Hardy remained silent as to prospective juror 62. Furthermore, in his motion for a new trial, in which he made a lengthy Batson argument, Hardy failed to mention prospective juror 62. (C. 457-63.)

With the record and the aforementioned well-settled legal principles in mind, we now address the three Batson arguments that Hardy raises on appeal.

## A.

Hardy first argues that the trial court erroneously denied his Batson challenge, citing the following three arguments that he made at trial: (1) that "the State struck seven of the eight eligible African-American jurors that remained in the venire after removing jurors for cause," (2) that "the State struck five African-American jurors in a row," and (3) that "Hardy's jury was all-white." (Hardy's brief, p. 23.) Giving deference to the trial court's findings, we hold that the trial court's rejection of those arguments was not clearly erroneous.

The State's striking five black prospective jurors in a row, when the vast majority of the strikes, including those particular strikes, were

34

conducted in numerical order and when the first strike exercised was not of a black prospective juror, did not establish racial discrimination. Likewise, the State's striking seven of eight black prospective jurors or the fact that Hardy was tried by an all-white jury did not establish racial discrimination, particularly in light of the State's obviously race-neutral explanations for its strikes, which Hardy did not even challenge below. Indeed, at trial, other than his argument as to the disparate treatment of prospective jurors 15, 26, and 27 in relation to prospective juror 56, Hardy relied on "'numbers alone' to establish a prima facie case of racial discrimination, which is insufficient." Shanklin v. State, 187 So. 3d 734, 766 (Ala. Crim. App. 2014). Cf. Ex parte Thomas, 659 So. 2d 3, 5 n.1 (Ala. 1994) (noting "that a defendant can establish a prima facie case solely on the fact that a prosecutor used a large number of his peremptory challenges to strike black veniremembers"). Here, although the State struck 7 of 8 black prospective jurors, it used only 7 of its 17 strikes to strike black prospective jurors. In addition, although we consider the explanations offered by the State for its strikes without regard to whether Hardy made a prima facie showing, we must evaluate those "'"'in light of the strength [(in this case, the weakness)] of the prima facie

case,'"'" Iervolino, 472 So. 3d at 872 (citations omitted), in determining the third prong of a Batson challenge -- whether the trial court's determination regarding the defendant's showing of purposeful discrimination was clearly erroneous "'"in light of the parties' submissions."'" Iervolino, 402 So. 3d at 871 (citations omitted).  Here, Hardy objected to the jury based on numbers, the fact that "there are no minority jurors left within the panel," and his assertion that "[t]here are other jurors in this panel that are similarly situated."  Given the weakness of the arguments Hardy presented the trial court and the race-neutral grounds the State provided for its strikes (for all but prospective juror 62, who was inadvertently missed and is addressed in Part I.B. below), the trial court's ruling that there was no Batson violation was not clearly erroneous.  See, e.g., Lane v. State, 169 So. 3d 1076, 1116 (Ala. Crim. App. 2014) ("We do not find the statistics or defense counsel's assertions that in his opinion no legitimate reasons for the strikes were revealed during voir dire to be sufficient to establish a prima facie case of racial discrimination."), (judgment vacated on other grounds, Lane v. Alabama, 577 U.S. 802 (2015)).

Hardy also asserts for the first time on appeal that "African American jurors were treated differently from white jurors with similar views on the death penalty" and proceeds to reference 15 potential jurors who rated themselves a "5" regarding the death penalty, 4 of whom were black and were struck by the State. (Hardy's brief, p. 24.) Hardy then proceeds to discuss the details of their responses and the State's alleged disparate treatment of those prospective jurors, including during individual voir dire. Likewise, Hardy asserts for the first time on appeal that "[t]he seven African-American jurors that the State struck were also heterogenous except for their race." (Hardy's brief, p. 26.) However, none of Hardy's new arguments are preserved for review because they were not presented to the trial court. See, e.g., Iervolino, 402 So. 3d at 874 ("None of the arguments Iervolino makes on appeal [regarding why he believes the State's reasons were pretextual], however, were presented to the trial court. Therefore, they were not properly preserved for review. ...").

In sum, the State's reasons for its strikes were not pretextual but, rather, were legitimate race-neutral grounds, and Hardy did not refute them. The trial court's rejection of Hardy's Batson challenge, based on

the arguments Hardy presented to the trial court, was not clearly erroneous.

B.

Hardy argues on appeal that the trial court's denial of his <u>Batson</u> challenge was erroneous as to prospective juror 62 because the State did not offer any reason to the trial court for striking prospective juror 62. Hardy argues that he established a prima facie case, which resulted in a presumption that the State engaged in discrimination that the State failed to rebut. Hardy fails, however, to recognize that he abandoned and thereby waived his initial <u>Batson</u> challenge as to prospective juror 62, and this Court no longer reviews <u>Batson</u> claims for plain error. <u>See</u> <u>Henderson v. State</u>, [Ms. CR-21-0444, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024).

Hardy twice mentioned prospective juror 62 below -- in his initial <u>Batson</u> challenge to the State's striking of seven black prospective jurors and when he renewed his motion after a lengthy discussion of his challenge. However, Hardy was provided multiple opportunities to add to his <u>Batson</u> arguments at the time his challenge was made and even again the next day before trial began. Yet, Hardy never made any specific

38

mention of prospective juror 62 other than in his initial, general argument that the State struck seven of eight black prospective jurors and in his "renewal" of his objection as to the striking of seven black prospective jurors. Indeed, Hardy's general argument that the State struck five black prospective jurors in a row did not even apply to prospective juror 62. Hardy also failed to mention prospective juror 62 in his motion for a new trial. Even when the trial court stated that it had "addressed" all of the prospective jurors whose strikes Hardy had challenged, Hardy remained silent.

Hardy urges this Court to recognize that, once a prima facie case is established, the burden is on the State to provide a race-neutral reason for all of its strikes of black prospective jurors. (Hardy's brief, pp. 27-28 (citing Ex parte Williams, 571 So. 2d 987, 990 (Ala. 1990).) However, in Ex parte Williams, the defendant expressly argued at the trial level that the State had provided "no reason" for one of the prospective jurors whose strike was challenged. Id. Unlike in Williams, Hardy never alerted the trial court or the State that prospective juror 62 had not been addressed. It is axiomatic that, when one is afforded an opportunity to speak, "qui tacet, consentire videtur," meaning that "he who is silent is taken to

39

agree." See, e.g., Moore v. State, 175 So. 2d 135, 136 (Ala. 1954); Black's Law Dictionary 980 (2d ed. 1910). Under these circumstances, the onus was on Hardy to ensure that each prospective juror for whom he alleged a Batson violation was addressed on the record. By not alerting the trial court and the State of the mistake, Hardy deprived the State of a fair opportunity to provide its reasons for striking prospective juror 62. To find a Batson violation as to prospective juror 62 on appeal after Hardy failed to ensure that this claim was addressed below would allow defendants to "bite their tongues" and then receive "two bites at the apple" whenever a challenged prospective juror is inadvertently neglected below. Moreover, we cannot attribute error to the trial court when the defendant did not seek to address this particular claim for the same reasons the preservation rules exist and for the same reasons that we no longer engage in plain-error review of Batson claims. As Justice Murdock explained, "the most fundamental … reason for the proposition that plain-error review not be available to initiate a Batson inquiry on appeal[] is the fact that the failure of the trial court to initiate a Batson inquiry simply is not an 'error,' plain or otherwise, by the trial court." Ex

parte Floyd, 190 So. 3d 972, 982 (Ala. 2012) (Murdock, J., concurring in the result) (emphasis omitted).  In short,

> "[t]he decision whether to take advantage of the right to generate evidence for consideration by the trial court pursuant to the Batson procedure is a decision for the defendant, not for the trial court.  It is a voluntary decision as to whether to invoke a procedural device that has been made available to defendants in the trial context. … Not requesting it may be a strategic mistake by defense counsel, but counsel's mistake is not the trial court's 'error.'"

Id. at 983 (some emphasis added; some emphasis omitted).  See also 24 C.J.S. Criminal Procedure and Rights of Accused § 2549 (2016) ("The purpose of the [preservation] rule[s], as variously stated, is to give the trial court the opportunity to correct any alleged error or defect called to its attention before submission of the case to the jury, to prevent unlimited litigation through the device of propounding new questions at each stage of an appeal, and to insure fairness for all the parties to cases and to promote the orderly administration of the law.").  Thus, when the trial court indicated to counsel that it was of the opinion that all prospective jurors mentioned in Hardy's Batson motion had been addressed, Hardy had an obligation to notify the trial court of the alleged error.

41

The United States Supreme Court's opinion in <u>Johnson v. California</u>, 545 U.S. 162 (2005), supports our conclusion that the burden to ensure that the State provide a reason for its striking of prospective juror remained with Hardy, not the State or the trial court. There the respondent argued, as Hardy does here: "If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed." <u>Id.</u> at 170. Thus, "the argument goes, a prosecutor's failure to respond to a prima facie case would inexplicably entitle a defendant to judgment as a matter of law on the basis of nothing more than an inference that discrimination may have occurred." <u>Id.</u> The United States Supreme Court found this argument to be "misguided" when asserted by the State, and we find it to be equally misguided when asserted by the defendant. <u>Id.</u> As the United States Supreme Court explained: "<u>Batson</u>, of course, explicitly stated that <u>the defendant ultimately carries the 'burden of persuasion' to '"'prove the existence of purposeful discrimination</u>.'"'" <u>Id.</u> at 170-71 (quoting <u>Batson</u>, 476 U.S. at 93, quoting in turn <u>Whitus v. Georgia</u>, 385 U.S. 545, 550 (1967)) (emphasis added). Moreover, as the

42

Supreme Court stated, "[t]his burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'" Id. at 171 (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)). Accordingly, contrary to Hardy's contentions, even if he established a prima facie case of discrimination, the burden of persuasion remained on him, and, rather than attempting to carry that burden of persuasion, Hardy abandoned his claim as to prospective juror 62. Thus, contrary to his contentions, Hardy is not entitled to a new trial based on the State's failure to provide a reason for striking prospective juror 62. See generally Bui v. State, 627 So. 2d 855, 859 (Ala. 1992) (holding that Bui was not entitled to a new trial even though, on a Batson remand, the State "could not recall" (in other words, provided no reason) for the exercise of one of its strikes of a black prospective juror).

## C.

Hardy also contends that the State's grounds for striking six of the seven black prospective jurors it struck -- prospective jurors 15, 19, 26, 28, 27 and 52 -- were pretextual and, thus, that the trial court's rejection of his Batson challenge regarding those six prospective jurors was erroneous. This argument is refuted by the record and is without merit.

43

The State's proffered reasons, as set forth above, were not pretextual, and the trial court did not clearly err in rejecting Hardy's <u>Batson</u> claim based on his arguments below that prospective jurors 15, 26, 27 were similarly situated to prospective juror 56. And, the arguments that Hardy raises for the first time on appeal to show that those prospective jurors were similarly situated or that prospective jurors 19, 28, and 52 were similarly situated to prospective juror 56 are not properly before this Court for review. Hardy is thus due no relief on this claim.

## II.[5]

Hardy argues that the trial court erred by not sua sponte severing his capital-murder charge from his noncapital charges and trying them separately. This argument, however, was not raised below and, thus, was not preserved for review.

## III.[6]

Hardy argues that the trial court constructively amended his indictment for capital murder during a robbery by erroneously

---

[5]This issue is raised as Issue VI in Hardy's brief on appeal.

[6]This issue is raised as Issue VIII in Hardy's brief on appeal.

instructing the jury that it could find him guilty of capital murder during a robbery for robbing either Kathleen Lundy or Rusty Lundy even though Hardy was not indicted for the robbery or attempted robbery of Rusty Lundy. The State argues that this claim should be reviewed for plain error and that, under that standard, the error in the trial court's instruction is not reversible. For the reasons set forth below, we disagree with the State that Hardy's argument on appeal was not preserved, and we further hold that the trial court's constructive amendment of Hardy's indictment constitutes reversible error.

At the end of the trial court's guilt-phase instructions, Hardy objected "with respect to the capital murder charge and the felony murder charge ... based on Document Number 446, which was Defendant's Fifth Motion in Limine" asking that Rusty Lundy not be referenced during trial as "a victim of robbery himself" because Hardy was not indicted for robbing Rusty Lundy. (R. 1793.) The trial court responded that the instructions, which included Rusty Lundy as a possible victim of the robbery, were consistent with the pattern jury instructions, and Hardy's counsel again pointed the trial court to the motion in limine. The trial court then asked for the State's response "in

light of the Motion in Limine." (R. 1794 (emphasis added).) The State

argued that "it can be a robbery to any individual wherein someone is

killed [for] felony murder." (R. 1794.) Hardy's counsel replied:

> "I agree it would be a fair statement of law, but if you included any other fair statements of law that are not relevant to this case, it would still be a fair statement of law. Here, because Rusty Lundy was not included in the indictment with respect to any robbery, we would submit to this Court that it should be withdrawn or recalled and restated."

(R. 1794 (emphasis added).) The trial court overruled Hardy's objection.

(R. 1795.)

Although the brief discussion following Hardy's objection to the

trial court's erroneous instruction did not specifically use the words

"constructive amendment," it is clear that the basis for Hardy's objection

was that the jury was instructed that it could find Hardy guilty of capital

murder based on a robbery victim not included in the indictment. This

is even more clear when the parties and the trial court's discussions are

considered "in light of the [repeatedly referenced] Motion in Limine." (R.

1794.)

Although Hardy's pretrial written motion in limine asked the trial

court to exclude evidence of and any references "to a robbery against

[Rusty] Lundy [because it] would constitute improper collateral acts," it

46

also noted the lack of <u>notice</u> of the State's intent to introduce such evidence and that "[t]he <u>indictment</u> specifies that the robbery is alleged to occur against <u>Kathleen</u> Lundy." (C. 369 (emphasis added).) More importantly, when the motion in limine was argued on the morning that trial began, Hardy's counsel's arguments were clearly focused on ensuring that the evidence and arguments at trial would be properly limited to only the crimes <u>charged in the indictments</u>. Hardy's counsel argued that

> "the <u>indictment</u> is for a capital murder offense that Mr. Hardy is accused of, by <u>indictment</u>, against [Kathleen] Lundy. During the review of the discovery, there is at least some information that could be interpreted as <u>a separate and distinct robbery attempt or robbery against [Rusty] Lundy</u>, who we anticipate will be testifying in this trial occurring. Mr. Hardy <u>was never charged</u> with that offense. Again, the State didn't give written notice of their intent to use that, and even though it is referred to as a 'collateral bad act,' I think that everyone would agree that an additional count of Robbery in the First Degree would be another bad act, <u>another crime</u> although <u>not charged</u>. … So we would ask for that reference … to be excluded."

(R. 409-10 (emphasis added).) When the State responded that, although Hardy was not indicted for the robbery of Rusty Lundy, it was part of the res gestae of the offense of capital murder during a robbery of Kathleen Lundy, Hardy's counsel responded:

47

"When the State receives <u>an indictment</u> in the case, it <u>puts the Defendant on notice</u> of specifically the allegations that he is expected to defend when it comes to trial. If the State had chosen to <u>indict</u> Mr. Hardy <u>on</u> Robbery in the First Degree or <u>Robbery in any degree involving [Rusty] Lundy</u>, then, certainly, I think we would all be on notice of the intent to -- of the need, the necessity to defend against that. ... Obviously, if [Rusty] Lundy witnessed the robbery of his wife, which is what [Rusty] Hardy is indicted for as part of the capital offense, then that would certainly be an appropriate thing for [Rusty] Lundy to testify about. If [Rusty] Lundy saw any of the actions relating to the <u>victim named in the indictment</u>, his <u>wife</u>, then certainly that is ... proper subject for him to be able to testify to. But <u>for him to testify about a totally separate different criminal act that</u>, for whatever reason, <u>was not charged</u> and tried to bootstrap that into being part of what happened, I think is a real danger of confusing what the issues are before the Jury."

(R. 412 (emphasis added).)

Moreover, when the trial court denied the motion in limine, it expressly stated that it was "willing to ... give a limiting instruction that, Number 1, Mr. <u>Hardy is not charged with robbing [Rusty] Lundy</u> and that ... <u>that's not to be part of what this Jury is to determine</u> in weighing the charges that are brought against Mr. Hardy." (R. 412 (emphasis added).)

It is well settled that "[t]he purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is

48

submitted to the jury." Ex parte Works, 640 So. 2d 1056, 1058 (Ala. 1994). Here, in light of the discussions surrounding the motion in limine, which were clearly referenced by both parties and the trial court in response to Hardy's objection to the court's erroneous instruction on capital murder, it is clear that the trial court understood that Hardy's objection to its instruction was that the jury should not be able to convict Hardy of capital murder during a robbery for a robbery of Rusty Lundy because Hardy was never indicted for a robbery of Rusty Lundy. The objection was timely, and the trial court was certainly given an opportunity to correct its error. Indeed, the trial court had just indicated at the start of trial that it would give a limiting instruction that the jury was not to consider a robbery of Rusty Lundy because Hardy had not been charged with that offense, making the denial of Hardy's objection perplexing.

We now address Hardy's argument on appeal -- that the trial court's guilt-phase instructions constructively amended the capital-murder indictment. Based on well-settled caselaw, we agree with Hardy that the trial court's instruction was erroneous and constitutes reversible error because it "lower[ed] the State's burden of proving each element of capital

49

murder beyond a reasonable doubt," made it "impossible to know the basis for the jury's potentially non-unanimous verdict," and deprived Hardy of fair notice of the charges. (Hardy's brief, p. 71.) Moreover, even if this Court did not find Hardy's claim to be preserved and reviewed it for plain error only, the error would still require reversal based on well-settled precedent, as we discuss below.

Hardy was indicted for capital murder during a robbery as follows:

"Warren Terrell Hardy, whose name is unknown to the Grand Jury other than as stated, did intentionally cause the death of another person, to-wit: <u>Kathleen Lundy</u>, by shooting <u>her</u> with a gun, and said Defendant caused said death during the time that said Defendant was in the course of committing or attempting to commit a theft of property of the following property: To-wit, a 2015 Lexus ES 350, the property of Kathleen Lundy, by the use of force or by threatening the imminent use of force against the person of <u>Kathleen Lundy</u> with the intent to overcome <u>her</u> physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property while the said Warren Terrell Hardy, whose name is unknown to the Grand Jury other than as stated, was armed with a deadly weapon or dangerous instrument, to-wit: a handgun."

(C. 779 (emphasis added.)) However, in its guilt-phase instructions, the trial court instructed the jury that,

"[t]o convict, the State must prove beyond a reasonable doubt each of the following elements of an Intentional Murder During Robbery in the First Degree. There are six elements …

50

"First, that Kathleen Lundy is dead;

"Second, that the Defendant caused the death of Kathleen Lundy by shooting her;

"Third, that in committing the acts that caused the death of Kathleen Lundy, the Defendant intended to kill the deceased or another person;

"Fourth, that the Defendant committed or attempted to commit theft of [Kathleen] Lundy's Lexus automobile;

"Fifth, that in the course of committing or attempting to commit the theft, the Defendant either used force or threatened the imminent use of force against the person of <u>Kathleen Lundy or Rusty Lundy</u> with the intent to overcome <u>his or her</u> physical resistance or physical power to resist or to compel acquiescence to the taking of or escaping with the property;

"Sixth, that the murder took place during the robbery."

(R. 1744-45 (emphasis added).)

Moreover, during its instruction on the elements of <u>felony murder</u>, the trial court <u>repeated</u> its instruction that the use of force or the threat of the use of force could have been against "<u>either Kathleen Lundy or Rusty Lundy</u>, with intent to compel acquiescence to the taking of or escaping with the property." (R. 1749 (emphasis added).)

"A constructive amendment of an indictment occurs when the terms of the indictment are altered by evidence <u>or jury instructions</u> that modify

51

the essential elements of the charged offense, thereby establishing a substantial likelihood that the defendant was convicted of an offense other than the offense charged in the indictment." Ex parte Phillips, 287 So. 3d 1179, 1221 (Ala. 2018) (emphasis added). See also Rule 13.5, Ala. R. Crim. P. ("The court may permit a charge to be amended without the defendant's consent, at any time before verdict or finding, if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced." (emphasis added)). This Court has "held that a defendant may be convicted of multiple counts of capital murder during a robbery arising out of a single act or transaction where there are multiple robbery victims, albeit only one murder victim." McKinnis v. State, 99 So. 3d 1265, 1275 (Ala. Crim. App. 2012). Accordingly, we agree with Hardy that the trial court's instructions to Hardy's jury, by naming Rusty Lundy as an additional robbery victim, impermissibly charged him with an additional and different offense for which he was not charged and, thus, had no notice that he was required to defend against. Accordingly, as we held in McKinnis under nearly identical circumstances, Hardy is entitled to a new trial.

52

In <u>McKinnis</u>, on which Hardy relies in support of his argument that the trial court's instruction constituted reversible error, this Court reversed McKinnis's conviction and sentence for capital murder during a robbery of Conaway, as alleged in the indictment, because the trial court had instructed the jury, as here, that, to convict, the jury had to find that McKinnis robbed "<u>either</u> Conaway <u>or</u> Belser [who was killed]." 99 So. 3d at 1271, 1273. According to this Court, "[t]he evidence …, as in <u>Brooks v. State</u>, [973 So. 2d 380, 402 (Ala. Crim. App. 2007),] undoubtedly established multiple robberies." <u>Id.</u> This Court thus rejected a finding of harmless error, stating that "the State's case at the guilt phase of the trial was not presented in such a fashion as to <u>specifically distinguish</u> Conaway as the victim of the <u>robbery</u> charged and Belser as the victim of the <u>murder</u> charged." <u>Id.</u> (emphasis added). As at Hardy's trial, "the focus of the State's case was on McKinnis's <u>intent to kill, not on the robbery element</u> of the crime." <u>Id.</u> (Emphasis added). This Court also noted in <u>McKinnis</u>, as here, that the trial court did not "specifically link its instructions to the factual allegations of the indictment." <u>Id.</u> at 1283. This Court then held that "[t]he trial court's jury-instruction amendment

53

here adversely affected McKinnis's substantial rights and had an unfair prejudicial impact on the jury's deliberations." Id. at 1283.

Likewise, in Brooks v. State, 973 So. 2d 380, 402 (Ala. Crim. App. 2007), upon which Hardy also relies, this Court also found plain error based on the trial court's erroneous instruction, which amended the indictment. Brooks was charged with capital murder during a robbery of Forrest Bowyer, the father, but the jury was instructed that it could convict Brooks if it found that he robbed Brett Bowyer, Forrest's son. However, in so holding, we considered the trial court's erroneous instructions "in light of the ambiguity in the State's presentation of its case." Id. at 409 (emphasis added). For example, "at no time did the prosecutor specifically argue that Forrest Bowyer was the victim of the robbery underlying the capital murder charge" as charged in the indictment. Id. at 410 (emphasis added).

In sum, as this Court held in Brooks and again in McKinnis, the trial court's jury instructions to Hardy's jury constructively amended the indictment by charging a new or different offense because Hardy could have also been charged for a crime against Rusty Lundy, who was named in the trial court's instructions as an alternative and different robbery

victim.  As in <u>Brooks</u> and <u>McKinnis</u>, the evidence presented at trial established that Hardy robbed both Kathleen Lundy and Rusty Lundy, and the jury could have convicted Hardy of the capital offense based on the robbery of Rusty Lundy, for which Hardy was not indicted.  This is particularly so because, as in <u>McKinnis</u>, the trial court's instructions were not "specifically link[ed]" to the indictment.  99 So. 3d at 1283.  Indeed, the trial court did not read the indictment to the jury during its guilt-phase instructions.  And, as in <u>Brooks</u>, although "the trial court read the indictment to the jury," "it did so before voir dire examination," approximately a week before the final guilt-phase instructions were given.  <u>Brooks</u>, 973 So. 2d at 408.  Based on the circumstances presented in Hardy's case, as in <u>Brooks</u> and <u>McKinnis</u>, the trial court's erroneous instruction was reversible error.

Here, the trial court's instruction to Hardy's jury -- that it could find Hardy guilty for a robbery of <u>either</u> <u>Kathleen</u> Lundy <u>or</u> <u>Rusty</u> Lundy -- ran afoul of Rule 13.5, Ala. R. Crim. P., by broadening Hardy's capital-murder indictment.  This error resulted in a "substantial likelihood" that Hardy was convicted of an offense for which he was not charged or that different jurors reached their guilty verdict for different reasons.  <u>Ex</u>

parte Phillips, 287 So. 3d at 1221.  When reviewing this issue, Hardy's indictment cannot be viewed in isolation.  Rather, the erroneous jury instruction must be considered in the context of both the evidence and arguments presented during the guilt phase of Hardy's trial.

We acknowledge that the trial court properly read Hardy's indictment for the capital murder of Kathleen Lundy during a robbery of Kathleen Lundy during voir dire on April 6 and April 7, 2022, approximately one week before the jury returned its guilty verdict. (R. 541-42, 788.)  (See also C. 779.)  However, as in Brooks, we cannot "assume that the jurors remembered, seven days later, the specific wording of the indictment charging capital murder during a robbery as it was read to them before voir dire examination," particularly "in light of the ambiguity in the State's presentation of its case." 973 So. 2d at 409.

There was also considerable ambiguity during Hardy's trial regarding whether Kathleen Lundy was the victim of the robbery.  Both Rusty Lundy and Hardy provided testimony indicating that Rusty Lundy was robbed by Hardy.  Specifically, according to Rusty Lundy, when he opened the door for his wife, he immediately saw a visibly "angry" Hardy walking up to them, and Rusty Lundy asked: "'Can I help you?'"  (R.

56

1051.)  When Rusty Lundy said to Hardy, who was armed, "What can I do to help," Hardy responded: "I want the keys to <u>your</u> car."  (R. 1051 (emphasis added).)  Hardy then grabbed Kathleen Lundy around her neck while pointing the gun at <u>Rusty</u> Lundy.  (R. 1051-52.)  <u>Rusty</u> Lundy responded to those threats (to both his wife and him) by assuring Hardy: "'The keys are right here next to me on this red sideboard.  All I need to do is get them for you.'"  (R. 1052, 1060.)  Then, <u>Rusty</u> Lundy gave Hardy the keys to <u>the Lundys'</u> white Lexus, and Hardy left in <u>their</u> car after shooting <u>Kathleen</u> Lundy.  (R. 1052-53.)  Rusty Lundy reiterated on cross-examination that Hardy demanded: "'Give me the keys to your car.' He was angry, he was pointing a gun at me, so I really don't remember every word."  (R. 1058.)  Likewise, in Hardy's interview with Inv. Hines that was played at trial, Hardy said that "the lady's husband" had come outside too and that he told them: "'I don't have time for this shit, just give me the keys.'"  (State's Exhibit 131.)  Hardy also said at the end of that interview that he never wanted to kill anyone, but he volunteered that he used the gun "as a scare tactic" to get the keys to the car.  (State's Exhibit 131.)  Hardy, also admitted that, as soon as he got the keys, he got in the Lexus and chased after Jessica.  At trial, Hardy further

57

testified that <u>Rusty</u> Lundy retrieved the keys and threw the keys at Hardy. The State's closing argument also portrayed Rusty Lundy as a victim of the robbery by arguing that Hardy told Inv. Hines the following: "'I asked for the keys. Then her husband came up, and I asked him for the keys, and I pulled the gun out and said, "Look, man, I ain't got time for this shit. Just give me the keys. Give me the keys. Give me the keys, man.'" (R. 1706-07.) In addition to evidence indicating that <u>Kathleen</u> Lundy was the victim of the robbery, there was clearly evidence indicating that <u>Rusty</u> Lundy was the victim of the robbery, but Hardy was not indicted for the robbery of <u>Rusty</u> Lundy, and the trial court's instruction allowing the jury to convict Hardy of capital murder based upon the robbery of <u>Rusty</u> Lundy was error.

In sum, we reverse Hardy's capital-murder conviction and remand this case for a new trial on that offense. Hardy was not given notice, based on any indictment, that he would be required to defend against the robbery of <u>Rusty</u> Lundy at trial. Moreover, the evidence established the elements of the robbery component of the capital-murder charge as to <u>both</u> Kathleen <u>and</u> Rusty Lundy.[7] Based on this record, we are unable to

---

[7]Section 13A-8-43(a), Ala. Code 1975, provides:

conclude beyond a reasonable doubt that the jury unanimously convicted Hardy of capital murder during a robbery for the robbery of <u>Kathleen</u> Lundy after having been instructed it could also convict Hardy based on the robbery of <u>Rusty</u> Lundy.

## IV.[8]

Hardy argues that the trial court erred by failing to remove "unqualified" prospective jurors. More specifically, with one exception, Hardy argues that the trial court erred by not sua sponte removing more than a half-dozen prospective jurors from the jury venire. The only

---

"A person commits the crime of robbery in the third degree if in the course of committing a theft he:

"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."

Section 13A-8-2 provides that "[a] person commits the crime of theft of property if he … [k]nowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his or her property."

[8]This issue was raised as Issue IX in Hardy's brief on appeal.

59

prospective juror for whom Hardy made a for-cause challenge was number 22. This claim is meritless.

Section 12-16-150, Ala. Code 1975, provides the following grounds for challenging a juror for cause in a criminal case:

> "(1) That the person has not been a resident householder or freeholder of the county for the last preceding six months.
>
> "(2) That he is not a citizen of Alabama.
>
> "(3) That he has been indicted within the last 12 months for felony or an offense of the same character as that with which the defendant is charged.
>
> "(4) That he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, either with the defendant or with the prosecutor or the person alleged to be injured.
>
> "(5) That he has been convicted of a felony.
>
> "(6) That he has an interest in the conviction or acquittal of the defendant or has made any promise or given any assurance that he will convict or acquit the defendant.
>
> "(7) That he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.
>
> "(8) That he is under 19 years of age.
>
> "(9) That he is of unsound mind.
>
> "(10) That he is a witness for the other party."

In <u>Iervolino</u>, 402 So. 3d 844 (Ala. Crim. App. 2023), this Court explained:

> "'"To justify a challenge of a juror for cause there must be a statutory ground (Ala. Code Section 12-16-150 (1975)), or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." <u>Nettles v. State</u>, 435 So. 2d 146, 149 (Ala. Crim. App.), aff'd, 435 So. 2d 151 (Ala. 1983). Section 12-16-150 sets out the grounds for removal of veniremembers for cause in criminal cases .... In addition to the statutory grounds, there are other common-law grounds for challenging veniremembers for cause where those grounds are not inconsistent with the statute. <u>Smith v. State</u>, [213 So. 3d 108 (Ala. Crim. App. 2000)], aff'd in pertinent part, rev'd in part, [213 So. 3d 214] (Ala. 2003); <u>Kinder v. State</u>, 515 So. 2d 55, 60 (Ala. Crim. App. 1986). Here, we are dealing with the common-law ground for challenge of suspicion of bias or partiality. See discussion of the common-law grounds for challenge in <u>Tomlin v. State</u>, 909 So. 2d 213 (Ala. Crim. App. 2002), remanded for resentencing, 909 So. 2d 283 (Ala. 2003). Ultimately, the test to be applied is whether the veniremember can set aside his or her opinions, prejudices, or biases, and try the case fairly and impartially, according to the law and the evidence. <u>Smith v. State</u>, supra. This determination of a veniremember's absolute bias or favor is based on the veniremember's answers and demeanor and is within the discretion of the trial court; however, that discretion is not unlimited. Rule 18.4(e), Ala. R. Crim. P., provides, in part: "When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case." Even proof that a veniremember has a bias or fixed opinion is insufficient to support a challenge for cause. A prospective juror should not be disqualified for prejudice or bias if it appears from his or her answers and demeanor that the

61

influence of that prejudice or bias can be eliminated and that, if chosen as a juror, the veniremember would render a verdict according to the law and the evidence. Mann v. State, 581 So. 2d 22, 25 (Ala. Crim. App. 1991); Minshew v. State, 542 So. 2d 307 (Ala. Crim. App. 1988).'"

402 So. 3d at 868 (quoting McGowan v. State, 990 So. 2d 931, 951 (Ala. Crim. App. 2003)).

"'A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." [Wainwright v.] Witt, 469 U.S. [412] at 429, 105 S. Ct. [844] at 855, 83 L. Ed. 2d 841 [(1985)]. That finding must be accorded proper deference on appeal. Id. "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So. 2d 191, 198 (Ala. Cr. App.), cert. denied, Ex parte Nobis, 401 So. 2d 204 (Ala. 1981).'"

Id. at 868-69 (quoting Martin v. State, 548 So. 2d 488, 490-91 (Ala. Crim. App. 1988)).

This Court further recognized: "'[I]t will be a rare case in which plain error is found based on a trial court's failure to strike a juror sua sponte.'" Id. (emphasis added) (quoting State v. Pike, 614 S.W.3d 651, 656-57 (Mo. App. W.D. 2021)). We will, thus, not address Hardy's arguments as to the multiple prospective jurors that he believes the trial court should have sua sponte struck for cause. As we noted in Iervolino,

"[a] majority of the federal circuit courts of appeals will not consider a biased-juror argument if the appellant did not object to the allegedly biased juror during the jury-selection process." Id. at 870 (quoting State v. Geleneau, 873 N.W. 3d 373, 380-81. (Minn. App. 2015). Neither will this Court. Indeed, "'"'[t]he rule requiring contemporaneous objections to the qualifications of jurors is well founded. It serves to minimize the incentive to sandbag in the hope of acquittal and, if unsuccessful, mount a postconviction attack on the jury selection process.'"'" Id. (quoting People v. Metcalfe, 202 Ill. 2d 544, 556, 270 Ill. Dec. 69, 77, 782 N.E.2d 263, 271 (2002), quoting in turn State v. Wright, 30 S.W.3d 906, 914 (Mo. Ct. App. 2000), quoting in turn State v. Hadley, 815 S.W.2d 422, 423 (Mo. 1991)).

Hardy's argument that prospective juror 22 should have been struck for cause was, however, preserved, and we review this argument for an abuse of discretion.

Hardy contends that, during voir dire, prospective juror 22 "repeatedly indicated he would not be able to consider mitigating evidence" and that, in his juror questionnaire, prospective juror 22 "strongly agreed that Black people commit more crimes than white

63

people, that he disagreed with interracial marriage, ... that he would not want his child to marry someone of a different race," that he was "exposed to media coverage of the incident and [that] his brother-in-law, a 'prison guard,' was 'murdered by an inmate' in 2020." (Hardy's brief, pp. 72-74.) Hardy's arguments are without merit.

Initially, we note that prospective juror 22 did not sit on Hardy's jury. Rather, prospective juror 22 was an alternate juror and was removed before jury deliberations began. Thus, any error in the denial of Hardy's challenge for cause of prospective juror 22 was harmless beyond a reasonable doubt. See, e.g., Thompson v. State, 153 So. 3d 84, 115 (Ala. Crim. App. 2012) ("'[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike.'"). Indeed, it is well settled that "the failure to grant two challenges for cause may be harmless." Thomas v. State, 399 So. 3d 1073, 1084 (Ala. Crim. App. 2023) (citing Doster v. State, 72 So. 3d 50, 71-72 (Ala. Crim. App. 2010)) (emphasis added). Cf. Ex parte Colby, 41 So. 3d 1, 5 (Ala. 2009) (holding that the trial court's error in not granting three strikes for cause was not harmless because "there were 'multiple errors on the part of the trial court in

improperly denying [the defendant's] challenges for cause'" and "[t]he record indicates that the seated jury included jurors who knew witnesses for the State, jurors who expressed strong support for the death penalty, and jurors who felt that it was defense counsel's job to prove the defendant's innocence" (quoting General Motors Corp. v. Jernigan, 883 So. 2d 646, 673 (Ala. 2003))).

Moreover, the trial court did not abuse its discretion by denying Hardy's motion to strike prospective juror 22 for cause. Both the State and Hardy had concerns about prospective juror 22 and asked to conduct individual voir dire. The State questioned prospective juror 22 first about his remarks that the death penalty would be appropriate only if the murder was "beyond a shadow of a doubt." (Questionnaire no. 113.) After a lengthy colloquy, prospective juror 22 indicated that he understood that the standard was beyond a reasonable doubt as to both the guilt and penalty phases, and the State was satisfied. (R. 673-78.) Hardy then questioned prospective juror 22 regarding the indication in his questionnaire that his support for the death penalty was an "8" out of "10," with 10 being strongly in favor. (R. 678; Questionnaire no. 110.) Hardy proceeded to question prospective juror 22 on what circumstances

he "would be able to present that would get [him] to vote against the death penalty" if the State were able to prove at least one aggravating circumstance of capital murder during a robbery during the guilt phase. (R. 680.) Prospective juror 22 indicated that he would have "a lot of difficulty" weighing facts and deciding whether a fact "should weigh higher than [another] fact." (R. 680.) Hardy's counsel then said: "And even if the Judge asked you to set that personal thought process aside and follow the law … based on your common sense and your experience and your job training and so forth, that you're just kind of wired that way?" (R. 681.) Prospective juror 22 stated: "I believe I am." (R. 681.) Hardy's counsel then stated he had "no further questions," at which point the trial court explained: "[P]art of my instructions [if guilt is found] are also that the jurors are to go through a weighing process of any aggravators and weighing any mitigators that are found to exist." (R. 681.) The trial court then asked prospective juror 22 if "within the rules that govern this process … could you go through that weighing process or is it just an automatic?" (R. 682.) Prospective juror 22 stated that "[i]t would be difficult," but he explained that he "could probably be convinced to give more weight or equal weight to the mitigating circumstances, but

66

[he] ha[s] never done that." (R. 682.) The trial court acknowledged that the whole process is difficult, "and it should be," but asked again if prospective juror 22, "would … be able to go through that weighing and contemplation process that my instructions will require all the jurors to go through?" (R. 682-83.) Prospective juror 22 responded: "I believe I could go through it with a fair and open mind." (R. 683.)

The trial court, <u>not</u> Hardy's counsel, then proceeded to address some of prospective juror 22's questionnaire responses. Specifically, because prospective juror 22 had stated that he was "uncomfortable" with and disagreed with interracial marriage, the trial court asked if he would be "unfair or biased against either side" because "this case involves an interracial relationship." (R. 683; Questionnaire no. 42-45.) Prospective juror 22 responded: "No, sir." (R. 683.) The trial court also asked prospective juror 22 about his questionnaire response that he had heard or watched a news report about the murder of Kathleen Lundy but stated that he "remembered nothing beyond what the judge reviewed" during voir dire. (R. 684; Questionnaire nos. 100-01.) The trial court noted that in his answers prospective juror 22 had stated he "didn't recall anything that [he] saw on those media reports beyond what [the court] informed

the jury venire," and prospective juror 22 stated that was correct. (R. 684.) The trial court then asked prospective juror 22: Despite "prior media exposure, would you be able to set that aside and decide this case based solely on the evidence as presented through this trial process?" (R. 684.) Prospective juror 22 responded: "Yes." (R. 684.) Prospective juror 22 stated that he had been unable to "work two consecutive days" since having "chemical treatments and radiation" in 2016. (R. 685.) The trial court also asked prospective juror 22 about stating on his questionnaire that he had a problem with fatigue, but prospective juror 22 stated that he believed that he could serve as a juror although he wanted to give the court "a heads up that you may have to activate one of those alternate jurors." (R. 686.)

After the trial court finished questioning prospective juror 22, Hardy's counsel then stated that he had overlooked a question and proceeded to ask about prospective juror 22's brother-in-law who, according to the questionnaire, had been a prison guard and had been killed by an inmate. Hardy's counsel asked if that incident, which occurred in 2020, would affect his "ability to weigh the evidence and listen and make decisions in this case." (R. 686.) Prospective juror 22 stated:

"No, it would not affect my ability to make a decision." (R. 686.) Hardy's counsel also asked prospective juror 22 about his fatigue, and he reiterated that he would like to serve and thought he "could do a good job" as a juror although acknowledging he had concerns about a long trial. (R. 687-88.)

After the individual voir dire, Hardy's counsel moved for prospective juror 22 to "be excused for cause," arguing:

"I understand, on its face, he may have begun the rehabilitation process with regards to his views on the death penalty, but when I questioned him, he was pretty clear what the objective standard that would be in front of him with the aggravators that the State would prove, that, once proven, it would be very, very difficult for him to outweigh [the aggravators] and to give reasonable and meaningful consideration to a different version.

"But perhaps as equally troubling is Juror 22's fatigue …. [H]e said … [he] has not been able to do back-to-back consecutive days of work …. [I]f he hasn't been able to work consecutive days and he's already talking about the backup plan of 'Be ready to activate an alternate juror,' I just think that at this point, he would be due to be excused. I don't think, despite his best intentions, it would be reasonable to believe he would be able to participate in two and possibly longer weeks of the trial process. I will note to the Court that Monday was the day that he filled out the questionnaire, and he was in the morning session, so he certainly would have been gone after approximately a half-day of subjecting himself to that portion of the trial, and he said that required a nap. …

69

"I just think, at this point, the better course of action, and the law would require, that he be excused on that for those reasons."

(R. 688-90.)

The State argued that prospective juror 22 was "obviously coherent, … obviously engaged," and that his taking a nap at 4:00 in the afternoon or his "potential for fatigue at some point" was not disqualifying. (R. 690.) As for his views on the death penalty, the State argued that prospective juror 22 "was pretty clear when he said he could keep an open mind and would consider both sides." (R. 690-91.) The trial court agreed that prospective juror 22 "was sufficiently rehabilitated on the death penalty issue" and that it was concerned only with prospective juror 22's fatigue. The trial court then overruled Hardy's motion.

Hardy has not challenged the trial court's failure to strike prospective juror 22 based on his fatigue. Rather, Hardy' challenge on appeal is that the trial court found prospective juror 22 to be rehabilitated on the only other ground that Hardy had based his request to strike him for cause -- his views on the death penalty. (R. 673-92.) We cannot say that the trial court, which was also able to observe prospective juror 22's demeanor and hear his responses, abused its considerable

70

discretion in finding he was rehabilitated and allowing him to serve as an alternate juror.

## V.[9]

Hardy argues that the trial court erred by removing "three Catholic jurors and another juror expressing religious reservations about the death penalty" -- prospective jurors 33, 54, 69, and 32. (Hardy's brief, pp. 88-89.) Three of those prospective jurors -- prospective jurors 33, 54, and 69 -- were removed without objection or argument from Hardy. Thus, Hardy's arguments on appeal as to those prospective jurors were not preserved.

Specifically, two of the prospective jurors, prospective jurors 54 and 69, were removed by the State during its exercise of peremptory strikes, and Hardy did not object to those strikes. The other two prospective jurors discussed on appeal -- prospective jurors 33 and 32 -- were struck for cause. Prospective juror 33 was struck for cause with no objection by Hardy.

Hardy's challenge to prospective juror 32 was preserved below, but it is without merit. Prospective juror 32 stated that, although he was not

---

[9]This issue was raised as Issue XIV in Hardy's brief on appeal.

opposed to the death penalty, he could not impose it himself and would not feel comfortable making a death recommendation for anything other than a child victim. Hardy spent a significant amount of time trying to rehabilitate prospective juror 32, who, nonetheless, admitted that he did not think he would be able to follow the law. Hardy then argued that he had been rehabilitated, but the trial court agreed with the State that prospective juror 32 should be removed for cause because he was never "rehabilitated to the point that he ever gave any indication that he would be able to go through [the necessary] weighing process." (R. 723.)

> "'The test for determining whether a strike rises to the level of a challenge for cause is "whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence." Marshall v. State, 598 So. 2d 14, 16 (Ala. Cr. App.1991). "Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause." Ex parte Nettles, 435 So. 2d 151, 153 (Ala. 1983). "The decision of the trial court 'on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.'" Nettles, 435 So. 2d at 153.'"

Lee v. State, 898 So. 2d 790, 844 (Ala. Crim. App. 2001) (quoting Dunning v. State, 659 So. 2d 995, 997 (Ala. Crim. App. 1994)). "Appellate courts in Alabama have repeatedly held that there is no violation of state or federal law in death-qualifying prospective jurors in a capital case."

Jackson v. State, 305 So. 3d 440, 465 (Ala. Crim. App. 2019). Moreover, "federal courts have held that death qualifying prospective jurors does not violate a juror's First Amendment right to freedom of religion," and this Court has agreed. Id. The death-qualification process ensures that a juror will be able to perform his or her duty in accordance with the law, as instructed by the trial court. "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases." Lockhart v. McCree, 476 U.S. 162, 176 (1986). "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Id. (emphasis added).

In this case, prospective juror 32 was removed for cause because he indicated that he could not follow the law. See § 12-16-152, Ala. Code 1975 ("On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment."). "Based on [the veniremember's] responses, the trial court could have reasonably concluded that the challenged veniremember[]

73

[was] ineligible to serve pursuant to § 12-16-152, Ala. Code 1975." <u>Lee</u>, 898 So. 2d at 844. Accordingly, we hold that the trial court did not err in granting the State's challenge for cause of prospective juror 32 "based on [his] feelings about the death penalty." <u>Id.</u> Hardy is not entitled to relief on this argument.[10]

Conclusion

Hardy's convictions and resulting sentences for two counts of first-degree kidnapping, for one count of first-degree domestic violence, and for one count of shooting into an occupied vehicle are affirmed. However, for the reasons stated in Part III of this opinion, we reverse Hardy's capital-murder conviction and death sentence and remand the case for a new trial on Hardy's charge of capital murder during a robbery of Kathleen Lundy.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

---

[10]We further note that Hardy's reliance on <u>303 Creative LLC v. Elenis</u>, 600 U.S. 570 (2023), in support of his argument is misplaced. In that case, an injunction was sought to "prevent the State from forcing [a business owner] to create wedding websites celebrating marriages that defy her beliefs." <u>Id.</u> at 580. Forcing a person to engage in speech against the person's religious beliefs is not akin to asking a potential juror to tell the truth about their ability to follow the law and to be qualified to serve on a jury.

Windom, P.J., and Kellum, Minor, and Anderson, JJ., concur.